**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

CHARLES JASON LIVELY,

             Petitioner,

v.                                       CIVIL ACTION NO. 2:15-cv-07458

DAVID BALLARD,

             Respondent.

**MEMORANDUM OPINION AND ORDER**

Before the Court are Respondent's Motion for Summary Judgment, (ECF No. 36), and Petitioner's Motion for Summary Judgment,[1] (ECF No. 40), on Petitioner's Amended Petition for Writ of Habeas Corpus Under 28 U.S.C. § 2254 ("the § 2254 Petition").[2] This matter was referred to United States Magistrate Judge Omar J. Aboulhosn for submission of proposed findings and a recommendation for disposition ("PF&R"). (*See* ECF No. 31.) On July 12, 2017, Magistrate Judge Aboulhosn submitted a PF&R recommending that the Court grant Respondent's Motion for Summary Judgment and deny Petitioner's Motion for Summary Judgment. (ECF No. 44.)

---

[1] Petitioner styles this document as a "Motion for Summary Judgment and Response to Respondent's Motion for Summary Judgment" wherein he asks the Court to deny Respondent's Motion for Summary Judgment and, "in the alternative, rule in favor of summary judgment for the Petitioner." (*See* ECF No. 40 at 1.) Despite the title and request, however, Petitioner "disagrees that there are no genuine issues of material fact in the matter . . . and therefore he argues that summary judgment is inappropriate." (*See id.* at 1–2.) The Court has a difficult time reconciling how Petitioner can argue both that there are genuine issues of material fact and that he is entitled to summary judgment. The document does not set out the standard for summary judgment, and its substance appears only to be responsive to Respondent's Motion for Summary Judgment. However, insofar as it is styled as a motion for summary judgment, the Court will consider it as such.

[2] Also pending before the Court is David A. Stackpole's Motion to Withdraw as Counsel. (ECF No. 47.) Because this Memorandum Opinion and Order disposes of the case, that motion is **DENIED AS MOOT**.

Petitioner filed timely objections to the PF&R on July 31, 2017. (ECF No. 48.) For the reasons that follow, the Court **OVERRULES** Petitioner's objections, and **DISMISSES** the § 2254 Petition.

## I. BACKGROUND

On November 21, 2006, Petitioner was convicted upon a jury verdict of first degree murder with recommendation for mercy[3] and first degree arson. (*See* ECF No. 23-12 at 7.) Petitioner had previously pled guilty to petit larceny in exchange for the dismissal of burglary and grand larceny counts. Thereafter, the trial court sentenced Petitioner to life in prison with mercy and a consecutive one-year term of imprisonment for the petit larceny conviction. (*See* ECF No. 23-13 at 18.)

The complete factual and procedural history of Petitioner's direct appeal and habeas proceeding in state court, as well as a review of Petitioner's claims in his federal habeas petition, are set forth in detail in the PF&R and need not be repeated here.[4] The Court will provide a discussion of any relevant facts from Petitioner's original criminal case as necessary throughout this opinion to resolve Petitioner's objections. The § 2254 Petition claims the following grounds for relief:

---

[3] W. Va. Code § 62-3-15 provides that a person convicted of first degree murder is not eligible for parole, but provides that "the jury may, in their discretion, recommend mercy, and if such recommendation is added to their verdict, such person shall be eligible for parole in accordance with the provisions of [Chapter 62, Article 12 of the Code], except that, notwithstanding any other provision of this code to the contrary, such person shall not be eligible for parole until he or she has served fifteen years . . . ."

[4] Insofar as Petitioner objects to the PF&R's description of the factual background in this case, the Court **OVERRULES** the objection recognizing that it advances no legal argument. The PF&R's description of the factual background is sufficient for purposes of deciding the legal issues before this Court. Nevertheless, an additional and exhaustive description of the case's factual background to which Petitioner does not appear to object may be found in the West Virginia Supreme Court of Appeals' decision from Petitioner's direct appeal. (ECF No. 23-3 at 91–103.)

Additionally, the record of Petitioner's trial proceedings, direct appeal, and collateral attack in state court has been attached as a number of exhibits to Respondent's previously adjudicated Motion to Dismiss, (ECF No. 23). For the sake of clarity, the Court cites the various documents throughout this Memorandum Opinion and Order according to the pagination provided in the ECF header of those exhibits.

1. The West Virginia Supreme Court of Appeals erred in holding that trial counsel was effective despite a comprehensive failure to safeguard the petitioner's rights or to subject the State's case to adversarial testing.

2. The West Virginia Supreme Court of Appeals erred in holding that appellate counsel was effective despite explicitly noted failures which foreclosed multiple grounds for relief entirely.

3. The West Virginia Supreme Court of Appeals erred in holding that the intimidation of a witness by an officer of the trial court does not rise to the level of a constitutional violation and did not deprive the petitioner of due process.

4. The West Virginia Supreme Court of Appeals erred in holding that the prosecuting attorney's suborning of the intimidation of a witness by an officer of the trial court does not rise to the level of a constitutional violation and did not deprive the petitioner of due process.

5. The West Virginia Supreme Court of Appeals erred in holding that the prosecuting attorney's refusal to disclose the identity of an informant was not a breach of his affirmative duties under *Brady v. Maryland*.

6. The West Virginia Supreme Court of Appeals erred in holding that the failure of the trial judge to recuse himself from the proceedings, despite his longstanding personal and political relationships with the alleged victim, did not deprive the petitioner of due process.

7. The West Virginia Supreme Court of Appeals erred in holding that the admission into evidence of testimony regarding the statement of an unidentified, unavailable informant was not a violation of the Confrontation Clause.

(ECF No. 20 at 6.)  The PF&R thoroughly analyzes each of Petitioner's claims as argued in the motions for summary judgment, and it recommends that this Court grant Respondent's Motion for Summary Judgment, (ECF No. 36), deny Petitioner's Motion for Summary Judgment, (ECF No. 40), and dismiss this matter from the Court's docket.

## II.  LEGAL STANDARDS

### A.  Review of Magistrate Judge's Findings and Recommendations

Pursuant to Federal Rule of Civil Procedure 72(b)(3), the Court must determine *de novo* any part of a magistrate judge's disposition to which a proper objection has been made.  The Court

is not required to review, under a *de novo* or any other standard, the factual or legal conclusions of the magistrate judge as to those portions of the findings or recommendation to which no objections are addressed. *Thomas v. Arn*, 474 U.S. 140, 150 (1985). Failure to file timely objections constitutes a waiver of *de novo* review and the petitioner's right to appeal this Court's order. 28 U.S.C. § 636(b)(1); *see also Snyder v. Ridenour*, 889 F.2d 1363, 1366 (4th Cir. 1989); *United States v. Schronce*, 727 F.2d 91, 94 (4th Cir. 1984). In addition, this Court need not conduct a *de novo* review when a party "makes general and conclusory objections that do not direct the Court to a specific error in the magistrate's proposed findings and recommendations." *Orpiano v. Johnson*, 687 F.2d 44, 47 (4th Cir. 1982).

### B. Habeas Corpus Standard of Review

A federal court may grant habeas relief for a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). "Therefore, when a petitioner's claim rests solely upon an interpretation of state case law and statutes, it is not cognizable on federal habeas review." *Weeks v. Angelone*, 176 F.3d 249, 262 (4th Cir. 1999), *aff'd*, 528 U.S. 225 (2000).

Section 2254(d), as modified by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), provides for a deferential standard of review to be applied to any claim that was "adjudicated on the merits" in state court proceedings. In such a case, a federal court may grant habeas relief only if the adjudication of the claim in state court

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Section 2254(d)(1) describes the standard of review to be applied to claims challenging how the state courts applied federal law. "A federal habeas court may issue the writ under the 'contrary to' clause if the state court applies a rule different from the governing law set forth in [Supreme Court] cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. 685, 694 (2002). "The court may grant relief under the 'unreasonable application' clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case." *Id.* The latter inquiry focuses on whether the state court's application of clearly established federal law was "unreasonable," as distinguished from whether it was "correct." *See Renico v. Lett*, 559 U.S. 766, 773 (2010); *Bell*, 535 U.S. at 694; *Williams v. Taylor*, 529 U.S. 362, 410 (2000).

Section 2254(d)(2) describes the standard to be applied to claims challenging how the state courts determined the facts. "[A] determination of a factual issue made by a State court [is] presumed to be correct," and the petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). "The phrase 'adjudication on the merits' in section 2254(d) excludes only claims that were not raised in state court, and not claims that were decided state court, albeit in a summary fashion." *Thomas v. Taylor*, 170 F.3d 466, 475 (4th Cir. 1999); *see also Harrington v. Richter*, 562 U.S. 86, 98 (2011) (recognizing that § 2254(d) applies even if the state court issued a summary decision unaccompanied by an explanation). The state court determination will be upheld so long as "fairminded jurists could disagree" on its correctness. *Yarbrough v. Alvarado*, 541 U.S. 652, 664 (2004).

### C. *Summary Judgment*

Federal Rule of Civil Procedure 56 governs motions for summary judgment. That rule provides, in relevant part, that summary judgment should be granted if "there is no genuine issue

as to any material fact." Summary judgment is inappropriate, however, if there exist factual issues that reasonably may be resolved in favor of either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "Facts are 'material' when they might affect the outcome of the case, and a 'genuine issue' exists when the evidence would allow a reasonable jury to return a verdict for the nonmoving party." *News & Observer Publ. Co. v. Raleigh–Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010). When construing such factual issues, the Court must view the evidence "in the light most favorable to the [party opposing summary judgment]." *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970). "When faced with cross-motions for summary judgment, the court must review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (internal quotation marks omitted) (citation omitted). The court will consider each motion individually, "tak[ing] care to resolve all factual disputes and any competing rational inferences in the light most favorable to the party opposing that motion." *Id.* (internal quotation marks omitted) (citation omitted). The nonmoving party may not rest on the pleadings alone and must show that specific material facts exist by offering more than a mere "scintilla of evidence" in support of his position. *Anderson*, 477 U.S. at 252.

### III.  DISCUSSION

Beyond the general objection to the PF&R's "recommendation that a grant of summary judgment be awarded to the Respondent," (ECF No. 48 at 2–3), Petitioner lodges thirteen specific objections to the PF&R.

#### A.  Ineffective Assistance of Counsel

Petitioner makes several objections to the PF&R regarding ineffective assistance of counsel ("IAOC") both at the trial and appellate levels. These objections relate to the PF&R's conclusion

that Respondent is entitled to summary judgment as to Grounds 1 and 2 of the § 2254 Petition. (*See* ECF No. 48 at 3–8; ECF No. 20 at 7–16.) Insofar as Petitioner raises any IAOC claim in his objections for the first time, the Court declines to review such habeas claims that should have been raised in the § 2254 Petition. *United States v. Humphreys*, 194 F.3d 1306, *1 (4th Cir. 1999) (unpublished table disposition) (finding a district judge did not abuse its discretion when it refused to consider a claim raised for the first time in objections to the magistrate judge's recommendation); *see also Samples v. Ballard*, 860 F.3d 266, 276 (4th Cir. 2017) (finding that this Court properly exercised its discretion in declining to hear a habeas claim raised for the first time in the petitioner's objections to the PF&R).

Petitioner must overcome two layers of deference for the Court to sustain his IAOC objections. First, the Supreme Court's pronouncement in *Strickland* accords to his counsel a "highly deferential" level of judicial scrutiny. *Strickland v. Washington*, 466 U.S. 668, 689 (1984). Courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . . ." *Id.* The burden falls to Petitioner to demonstrate otherwise. *See id.* at 690 ("A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance."). If counsel made a "strategic choice" after "thorough investigation of law and facts," the act is "virtually unchallengeable." *Id.* Acts or omissions not determined to be strategic—either because they were not adequately informed or they were not conscious decisions at all—are still analyzed by an objective reasonableness standard. *See Roe v. Flores-Ortega*, 528 U.S. 470, 481 (2000); *Kimmelman v. Morrison*, 477 U.S. 365, 375, 386 (1986).

If the reviewing court determines under this deferential standard that counsel's action fell outside the accepted range of professionally reasonable conduct, the challenger must also show that he was prejudiced by the errors—that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. *Id.* In addressing IAOC claims, courts may address either issue—counsel's performance or prejudice from the alleged error—first, since a finding adverse to the petitioner on either issue is dispositive. *See id.* at 697 ("There is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one. . . . If it is easier to dispose of [the] claim on the ground of lack of sufficient prejudice, . . . that course should be followed.").

In addition to this deferential standard, § 2254 petitioners making IAOC claims must show that the reviewing state court applied *Strickland* unreasonably. *See Elmore v. Ozmint*, 661 F.3d 783, 856–66 (4th Cir. 2011). The Supreme Court has noted that "[t]he standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." *Harrington*, 562 U.S. at 105 (internal quotation marks omitted) (citations omitted) (noting that "[s]urmounting *Strickland*'s high bar is never an easy task" and that "[e]stablishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult"). "When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.* Ultimately, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was

an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 103.

### 1. *Communication and Investigation*

First, Petitioner objects to the PF&R's conclusion that trial counsel engaged in an adequate investigation and communicated effectively with Petitioner. The PF&R finds that Respondent was entitled to summary judgment on this ground. (*See* ECF No. 44 at 19–22.)

This argument was originally raised by Petitioner in his state habeas petition, (*see* ECF No. 23-3 at 4–5, 16–18), for which the Circuit Court of McDowell County conducted an evidentiary hearing that included testimony from Petitioner's trial counsel, Mr. Floyd A. Anderson. (*See* ECF No. 23-4 at 102–41.) In its ruling, the circuit court noted the *Strickland* standard and summarized Mr. Anderson's testimony that "he had adequate time to investigate and prepare for trial, employed an experienced investigator to investigate this case, [and] discussed his pretrial and trial decisions in advance with petitioner including petitioner's decision to refuse a plea bargain and take his case to trial . . . ." (ECF No. 23-5 at 3–4.) On appeal, the WVSCA held the following:

> Petitioner's argument regarding a deficient investigation lacks specificity sufficient to allow us to evaluate this claim. However, we note that at the evidentiary hearing, Mr. Anderson testified that he hired an investigator who "investigated at least ten different people" and that, of those ten, Mr. Anderson personally spoke with six or seven, including speaking with Mr. Salyers several times. He also testified that he met petitioner in jail between five and fifteen times and spoke with him on the phone, as well. Based on the lack of specificity in petitioner's argument and the record before this Court, we cannot find that the circuit court erred in determining that petitioner did not carry his heavy burden of showing that he received ineffective assistance related to his counsel's investigation.

(*Id.* at 93.) Accordingly, 28 U.S.C. § 2254(d) applies, and the question becomes whether the state court's adjudication of Petitioner's communication- and investigation-based IAOC claim "was an unreasonable application" of *Strickland* or involved an unreasonable determination of the facts in light of the evidence presented. *See* § 2254(d); *see also Tice v. Johnson*, 647 F.3d 87, 103 (4th

Cir. 2011) ("The rule and analytical framework announced by the Supreme Court in *Strickland* 'unquestionably qualifies as "clearly established" federal law under § 2254(d).'" (quoting *Frazer v. South Carolina*, 430 F.3d 696, 703 (4th Cir. 2005))).

With regard to counsel's level of communication, Petitioner objects "on the basis that the record indicates the Petitioner's frequent frustration with counsel's lack of communication, and the failure of trial counsel to address this frustration." (ECF No. 48 at 3.) Counsel must communicate with clients and obtain consent as to the recommended course of action regarding fundamental issues, such as "pleading guilty, waiving a jury, taking the stand, and appealing a conviction or sentence . . . ." *United States v. Chapman*, 593 F.3d 365, 369 (4th Cir. 2010) (citing *Florida v. Nixon*, 543 U.S. 175, 187 (2004)). Despite counsel's duty to consult and communicate with his client regarding these "important decisions," *Strickland*, 466 U.S. at 688, federal law "does not require counsel to obtain the defendant's consent to 'every tactical decision.'" *See Nixon*, 543 U.S. at 187 (quoting *Taylor v. Illinois*, 484 U.S. 400, 417–18 (1988)). These tactical matters are better "left to the sound judgment of counsel." *See id.*

As to Petitioner's claim regarding counsel's investigation leading up to trial, Petitioner objects on the basis that trial counsel "fail[ed] to in any way involve the Petitioner in the investigation process or to provide him with the fruits of the supposed investigation." (ECF No. 48 at 3.) Under *Strickland*, counsel "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. . . . [A] particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." 466 U.S. at 691. If counsel "conducts a reasonable investigation of law and facts in a particular case, his strategic decisions are 'virtually unchallengeable.'" *Powell v. Kelly*, 562 F.3d 656, 670 (4th Cir. 2009) (quoting *Strickland*, 466

U.S. at 688).  To prevail on an IAOC claim based on a failure to investigate, a petitioner must specify "what an adequate investigation would have revealed . . . ."  *Bassette v. Thompson*, 915 F.2d 932, 940–41 (4th Cir. 1990).

Petitioner's two-sentence objection lodges no specific allegations of how the state court decision was an unreasonable application of federal law, nor does it explain how the state court made an unreasonable determination of the facts.  (*See* ECF No. 48 at 3.)  During the evidentiary hearing in state court, Mr. Anderson testified as follows regarding his investigation of the case and communication with Petitioner:

Q. And during the course of [] trials, do you routinely engage an investigator?

A. Yes, I do.

Q. In Mr. Lively's trial, did you engage an investigator?

A. Yes, I did.

Q. And who was your investigator?

A. That was Harold Wolfe.

. . .

Q. During the course of this case, how many times did you visit Mr. Lively while he was incarcerated?

A. I can't tell you exactly how many times, but it was -- it was several times, and I also spoke with him on the phone, and I also spoke with his mother.

Q. Several?  Would that several be five, ten, twenty?

A. I'm going to say somewhere between maybe five and fifteen . . . at least that many.

(ECF No. 23-4 at 104–05.)  Mr. Anderson continued to testify that Mr. Wolfe investigated "at least ten different people," six or seven with whom Mr. Anderson personally spoke.  (*Id.* at 108–09.) Mr. Anderson stated that he spoke with one of those witnesses, Brian Salyers, "at least three or

four times." (*Id.* at 109.) In addition, Mr. Anderson testified that he believed he did everything Petitioner asked him to do, had adequate time to investigate and prepare for the trial, and discussed with Petitioner the strategy and tactics used in preparing for trial. (*Id.* at 124; *see also id.* at 129.) Mr. Anderson stated at the hearing that he felt there was nothing Petitioner asked him to do that he did not do and that he felt he "had adequate contact with [Petitioner] in an effort to prepare for the trial." (*Id.* at 119, 124.) Petitioner's state and federal habeas petitions provide no more than repeated general allegations regarding counsel's lack of communication with Petitioner and efforts to engage in a meaningful investigation or explore possible defenses. (*See* ECF No. 20 at 8–9; ECF No. 23-3 at 4, 16–17; ECF No. 23-5 at 41; ECF No. 40 at 4.) Despite these allegations, Petitioner provides no evidence contradicting Mr. Anderson's testimony at the evidentiary hearing regarding counsel's communication and investigation.[5]

Given the testimony of Petitioner's attorney and lack of evidence to the contrary, the Court does not find that the state court unreasonably applied the *Strickland* standard or made an unreasonable determination of the facts. Mr. Anderson hired an investigator who interviewed many people; Mr. Anderson himself followed up with the majority of those people; and Mr. Anderson regularly discussed the investigation with Petitioner, including trial strategy. The record does not reflect a significant breakdown of communication between Petitioner and his counsel, and there is no evidence of a total lack of communication imperiling Mr. Anderson's ability to defend Petitioner adequately. Petitioner also does not specify what an "adequate investigation would have revealed . . . ." *See Bassette*, 915 F.2d at 940–42. This Court agrees with the state

---

[5] Petitioner's state and federal habeas petitions reference a letter that he sent to the trial court on November 28, 2005, "lament[ing] that his and his family's attempts to communicate with Mr. Anderson had been stymied and their suggestions as to avenues of investigation flatly ignored." (ECF No. 20 at 9; ECF No. 23-3 at 17; ECF No. 23-5 at 41; ECF No. 40 at 9.) He fails to expand on the contents of that letter or the trial court's response to it, and the letter does not appear to be a part of the record in this case.

court's ruling that Petitioner "did not carry his heavy burden of showing that he received ineffective assistance related to his counsel's investigation." (ECF No. 23-5 at 93.) Thus, the state court's decision was not contrary to, and did not involve an unreasonable application of, clearly established federal law, as determined by the Supreme Court, nor did it make an unreasonable determination of the facts. 28 U.S.C. § 2254(d).

Accordingly, the Court **OVERRULES** Petitioner's objection as to IAOC based on trial counsel's investigation and communication.

### 2. *Commentary by the West Virginia Supreme Court of Appeals*

Next, Petitioner objects to the PF&R's "inaccurate characterization of, and findings as to, the record and his arguments regarding the [West Virginia Supreme Court of Appeals'] assessment of counsel's performance in its direct appeal [decision]." (ECF No. 48 at 4.) Petitioner lists ten pronouncements by the West Virginia Supreme Court of Appeals ("WVSCA") in its direct appeal decision from the underlying criminal case in support of the objection:

> Trieal [sic] counsel offered no objection when Deputy Ronald Blevins testified second-hand about a supposed sighting of the Petitioner's co-defendant at the alleged crime scene.
>
> Trial counsel offered no objection to Jason Ritchie's testimony that he made a statement to a jailhouse informant, which was then relayed to police.
>
> Trial counsel failed to make a Confrontation Clause or hearsay argument at any point.
>
> Trial counsel failed to develop any other record below regarding the testimony of Deputy Blevins or Mr. Ritchie.
>
> The above failures constituted a waiver of the issues.
>
> Trial counsel never requested the identity of an alleged confidential informant until *after* the trial.
>
> The failure to raise the issue of this potentially exculpatory evidence until after the Petitioner's trial constituted a waiver of the issue.

Appellate counsel's failure, in the Petitioner's notice of appeal, to bring up the publication of a statement by Brian Salyers to the jury constituted a waiver of the issue.

Insofar as appellate counsel does eventually mention the above issue in his subsequent brief, he mentions it only in passing and without legal authority.

Trial counsel made an argument regarding potentially exculpatory evidence for the first time after the trial, but made neither a hearsay nor a Confrontation Clause argument. Appellate counsel made arguments regarding hearsay and the Confrontation Clause, but made no argument as to potentially exculpatory evidence.

(ECF No. 48 at 4 (emphasis in original).) After listing these "'significant' deficiencies," Petitioner avers that the PF&R improperly "glosses over and casts these statements as misrepresentations by the Petitioner." (*Id.* at 4–5.)

The PF&R reviews these comments by the WVSCA regarding trial and appellate counsel's performances under a section entitled "Ineffective Appellate Counsel Based on Explicitly Noted Failures." (*See* ECF No. 44 at 46.) The PF&R enumerates each of the ten comments made by the WVSCA, yet the PF&R appears to analyze the comments as if they only implicate the effectiveness of appellate counsel. (*See id.* at 47–51.) As the comments themselves indicate, the WVSCA was speaking to both trial and appellate counsel's effectiveness.[6] Further, the PF&R states that "[a] review of the record reveals that the [WVSCA] did not 'repeatedly' note deficiencies in appellate counsel's performance in its decision denying Petitioner's habeas appeal." (ECF No. 44 at 50.) This Court notes that the commentary to which Petitioner refers in his claim is found only in the WVSCA's decision on direct appeal, and he is not referring to commentary in the habeas decision. Ultimately, however, the PF&R rejects Petitioner's claim that a finding by the WVSCA on habeas

---

[6] The Court notes that Mr. Floyd Anderson represented Petitioner at trial, Mr. J. L. Hickok prepared Petitioner's petition for appeal, and Mr. David Schles prepared Petitioner's appellate brief and represented Petitioner on appeal. When addressing appellate counsel's failure to raise various claims, this Court presumes that the WVSCA was referring to Mr. Hickok, who prepared the petition for appeal.

review that counsel was effective cannot stand in light of the court's earlier commentary, and the Court now similarly rejects that argument.

As noted by Petitioner, the WVSCA made several comments throughout its decision on Petitioner's direct appeal regarding the performance of trial and appellate counsel.[7] For example, the court stated the following with regard to the testimony of Deputy Ronald Blevins and Jason Ritchie:[8]

> [T]here was no objection made by the Defendant at the time the deputy testified about the information given to him about seeing Mr. Owens at the Whitley residence nor was there an objection to Mr. Ritchie's testimony that Mr. Cline reported his statements to the police. Moreover, there was no other record developed below by the Defendant regarding the testimony of Deputy Blevins or the testimony of Mr. Ritchie violating the Confrontation Clause of the Sixth Amendment. Despite the lack of any objection or argument below regarding a violation of the Confrontation Clause of the Sixth Amendment, the Defendant now argues on appeal that the statement made by the confidential informant to police was "testimonial" in nature and violated the Confrontation Clause.

> . . .

> At the outset, the Court finds that this assignment of error was not properly preserved by the Defendant below. . . . Further, the Defendant did not complain before the trial court of any violation of the Confrontation Clause. The Court consistently has held that silence may operate as a waiver of objections to error and irregularities at the trial which, if seasonably made and presented, might have been regarded as prejudicial.

(ECF No. 23-2 at 104–06, 109 (internal quotation marks omitted) (citations omitted).) As to the comments related to the name of the confidential informant ("CI") and potentially exculpatory evidence, the WVSCA noted the following:

---

[7] Petitioner's objection formats the WVSCA's comments as they are direct quotations, but a review of the WVSCA's decision shows that Petitioner is paraphrasing from the court's opinion. (*Compare* ECF No. 23-2 at 104–06, 109–10, *with* ECF No. 48 at 4.)

[8] Specifically, Deputy Blevins testified that a confidential informant told him that he or she saw Petitioner's co-defendant, Mr. Owens, at Dr. Whitley's residence on the morning of the fire. (ECF No. 23-2 at 108.) The deputy provided this information in explaining why he went to interview Mr. Owens. (*See id.*) Jail inmate Jason Ritchie's testimony involved a statement "that he told [fellow jail inmate Michael] Cline about the Defendant's admissions to him (Ritchie), and that it was Mr. Cline who told the police." (*Id.*)

Finally, the Defendant also assigned as error in his brief (but not in his Petition for Appeal) the State's failure to disclose alleged exculpatory evidence under *Brady*. . . . As previously mentioned, the *Brady* issue was raised for the first time below in the post-trial motion. This argument was made in conjunction with the "failure" of the State to provide the [CI]'s name. There has been no assertion at any time by the Defendant that anything in the informant's statement would in any way tend to exculpate the Defendant. To the extent that the Defendant failed to raise the *Brady* issue in his Petition for Appeal as an assignment of error, and failed to develop the record regarding the issue, the argument is deemed waived and the Court is not required to consider this issue.

(*Id.* at 109–10.)

Regardless of any statements made by the WVSCA about counsel's performance in the direct appeal decision where IAOC claims were not raised, the *Strickland* standard creates a new lens through which the court must analyze IAOC claims in a habeas proceeding. As such, commentary made by the court in the earlier direct appeal does not foreclose a finding of effective counsel during a later habeas claim.

In its decision on the habeas petition, the WVSCA set out the *Strickland* standard, analyzed specific alleged shortcomings of trial counsel, and readdressed the claims regarding appellate counsel in the following passage:

In [the direct appeal opinion] we noted that appellate counsel failed to assign as error in the petition for appeal the State's failure to disclose allegedly exculpatory evidence under *Brady* . . . . In post-trial motions, counsel argued that the State failed to provide the name of a [CI]. However, we also noted that there had been no assertion by petitioner that anything in the informant's statement would, in any way, tend to exculpate petitioner. While we deemed the argument waived, given that the argument was not asserted in the petition for appeal, petitioner has failed to show that the assertion of the same in the petition for appeal would satisfy the second prong of the *Strickland/Miller* test.

(ECF No. 23-5 at 92, 94 (citations omitted) (citing *Strickland*, 466 U.S. at 668; Syl. pt. 5, *State v. Miller*, 459 S.E.2d 114 (W. Va. 1995)).)

A review of the state court's habeas decision shows that the WVSCA analyzed Petitioner's various IAOC claims regarding trial and appellate counsel, and it used the *Strickland* standard to

do so.  Notably, Petitioner does not argue that the correct standard was not used or that it was unreasonably applied to the facts presented to the habeas court.  The alleged errors made by counsel did not amount to a plain error on direct appeal, and the WVSCA subsequently held that they did not amount to ineffective assistance under *Strickland* on collateral attack.  The PF&R's "characterization" of the commentary does not provide any basis for relief as this Court's task is to review the state court's decision regarding alleged constitutional deficiencies.  *See* 28 U.S.C. § 2254(d).  In this respect, the Court finds that the IAOC determination made by the WVSCA did not unreasonably apply the *Strickland* standard and did not make an unreasonable determination of the facts in light of the evidence presented notwithstanding any comments made in its previous decision on direct appeal.

Thus, the Court **OVERRULES** Petitioner's objection as to IAOC based on the WVSCA's commentary in its direct appeal decision.

### 3. Motion to Recuse

Third, Petitioner objects to the PF&R's conclusion that trial counsel was effective despite "the lack of any strategic reasoning for counsel's failure to file a motion to recuse a potentially biased judge."  (ECF No. 48 at 5–6.)  Petitioner has insisted throughout the phases of his case that the trial court judge and the victim shared a close personal and political relationship and that trial counsel was ineffective for failing to move for the judge's recusal.  (*See id.*; ECF No. 20 at 9, 29–36; ECF No. 23-3 at 8, 29–30; ECF No. 23-5 at 24–39.)  The PF&R determines that the state court did not unreasonably apply *Strickland* and that summary judgment for Respondent is warranted on this ground.  (*See* ECF No. 44 at 25–33.)

The Circuit Court of McDowell County found that "[t]rial counsel's decision not to ask Judge Stephens to recuse himself was a tactical and strategic decision" that did not result in

ineffective assistance.  (*See* ECF No. 23-5 at 7.)  On appeal, the WVSCA recognized that while Mr. Anderson did not "file any motions raising potential issues of judicial recusal," Petitioner "failed to identify any evidence of actual prejudice or bias . . . , instead making speculative arguments."  (*See id.* at 91–92.)  The WVSCA, however, did not analyze the merits of this ground under *Strickland*.  The court simply noted Petitioner's claim that counsel was ineffective for failing to file any motion for recusal but did not subsequently scrutinize counsel's decision in its discussion of Petitioner's other IAOC arguments.  (*See id.* at 92–93.)  The WVSCA ultimately affirmed the lower court's ruling that the decision not to file a motion of recusal was strategic in nature.

While the WVSCA did not explain its rationale on this particular claim, the standard of review set out in § 2254(d) still applies.  *See Weeks*, 176 F.3d at 259 (citing *Wright v. Angelone*, 151 F.3d 151, 156–57 (4th Cir. 1998) (holding that a "perfunctory" decision constitutes an adjudication on the merits)) ("Where, as here, the state supreme court has adjudicated a claim on the merits but has given no indication of how it reached its decision, a federal habeas court must still apply the AEDPA standards of review.").  Further, "[w]hen there is a 'reasoned' lower court opinion denying the claim, the federal habeas corpus court can 'look through'" the higher court's summary decision and treat the lower court's opinion as the basis for the § 2254(d) analysis.  2 Randy Hertz & James S. Liebman, *Federal Habeas Corpus Practice and Procedure* § 32.2 & n.9 (7th ed. 2016) (citations omitted) (citing, *e.g.*, *Brumfield v. Cain*, 135 S. Ct. 2269, 2276 (2015)); *see Grueninger v. Dir., Va. Dep't of Corr.*, 813 F.3d 517, 525–27 (4th Cir. 2016); *see also Hope v. Cartledge*, 857 F.3d 518, 523 (4th Cir. 2017); *Loden v. McCarty*, 778 F.3d 484, 494–95 (5th Cir. 2015) ("Where a lower state court ruled on an element that a higher state court did not, the lower state court's decision is entitled to AEDPA deference."), *cert. denied*, 136 S. Ct. 402.  This

Court will analyze the Circuit Court of McDowell County's opinion for this claim under § 2254(d) because the WVSCA summarily affirmed the lower court's decision on the issue without explanation.

Petitioner's habeas counsel questioned Mr. Anderson at the evidentiary hearing before the Circuit Court of McDowell County about his decision not to file a motion to recuse:

> Q. Were you aware of a -- of a relationship between Doc Whitley and Judge Stephens?
>
> A. Yes. I received second-hand knowledge [of] that. I really didn't know Doc Whitley at all. I don't think I ever had a conversation with him during that time period, but through different conversations through different people, we were made aware that Doc Whitley and Judge Stephens had, at least through the Democratic Committee, a relationship through that.
>
> Q. You were aware of this prior to trial?
>
> A. Yes, prior to trial. Yes, I was.
>
> Q. And though you were aware of that, you never filed a motion to recuse Judge [Stephens]?
>
> A. No, I did not. After speaking with Mr. Lively and also speaking with his mother, who was present, that was an issue that we had discussed, and we just -- we did not do it.
>
> . . .
>
> Q. You are aware that the decision whether or not to file a recusal motion is not made by the defendant but by the attorney; correct?
>
> A. Well, like I say, I think motions are made -- the attorney decides or makes the decision, but whenever I make a decision, I usually talk with my clients and see what they feel is best, because it's their case.

(ECF No. 23-4 at 119–20, 121.) On cross-examination, Mr. Anderson conveyed some regret in not filing a recusal motion despite conferring with Petitioner and Petitioner's mother about the matter. (*See id.* at 137–38 ("I should have taken control at that point in time and just filed the motion in spite of any kind of decision. I should have done that.").) Mr. Anderson testified that

he was very familiar with Judge Stephens, having practiced before him for the duration of his "whole career, since [19]95," (*see id.* at 138–39), and that he believed Judge Stephens to be "an impartial fair judge" about whom he "couldn't say anything negative . . . ." (*Id.* at 139.) The Circuit Court of McDowell County held that Mr. Anderson's decision not to file a motion to recuse was "a tactical and strategic decision" that did not result in ineffective assistance. (*See* ECF No. 23-5 at 7.)

Although the ultimate reasonableness of counsel's strategic choice is a question of law to be reviewed under § 2254(d)(1), the prior question of whether counsel actually made a strategic choice is a question of fact. *Wood v. Allen*, 558 U.S. 290, 304 (2010). Thus, this Court can only disturb that determination if Petitioner can demonstrate that it was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Here, even according the deference due the state court adjudication, the Court is doubtful that counsel employed a "strategic choice" in not moving for the recusal of the presiding judge. Mr. Anderson testified at the evidentiary hearing that he was aware of a personal relationship between the trial judge and the victim in the underlying case that could support a motion for recusal, but counsel never articulated how or why he concluded that it was in his client's best interests not to file such a motion. (*See* ECF No. 23-4 at 119–21, 137–39.) However, it does not automatically follow from the fact that counsel's decision was not "strategic" that counsel's decision was therefore not professionally reasonable. *See Bullock v. Carver*, 297 F.3d 1036, 1050–51 (10th Cir. 2002) (citing *Strickland*, 466 U.S. at 688). Even where counsel admittedly errs or fails to make a conscious decision, the question of performance must be assessed at the time of the alleged error in light of all the circumstances. *See Kimmelman*, 477 U.S. at 381. Further, determining whether or not counsel's performance actually violated *Strickland* is not the task for

this Court.  *See Harrington*, 562 U.S. at 101; *see also Moore v. Hardee*, 723 F.3d 488, 496 (4th Cir. 2013) ("That a petitioner's *Strickland* claim may have had merit does not alone justify awarding habeas . . . .").  If the Court determines that counsel's overall performance was at least arguably reasonable from an objective standpoint, it cannot find the state court's ultimate rejection of the ineffective assistance claim to be an unreasonable application of clearly established federal law.  *See* § 2254(d)(1).

Notwithstanding Mr. Anderson's admission that he should have filed a motion of recusal given the benefit of hindsight, this does not, without more, overcome the presumption that he acted "within the wide range of reasonable professional assistance" when representing Petitioner.  *See Strickland*, 466 U.S. at 689.  Mr. Anderson had practiced before the trial judge in Petitioner's case for over a decade and considered him an impartial judge.  (*See* ECF No. 23-4 at 138–39.)  Mr. Anderson only knew of a general personal relationship between the judge and victim, and he discussed the issue with Petitioner and Petitioner's mother before deciding not to file a motion. (*See id.* at 119–20.)  Insofar as Petitioner attempts to use *Caperton v. A.T. Massey Coal Co., Inc.*, 556 U.S. 868 (2009), in support of his claim that there was clear judicial bias on which counsel should have acted, the WVSCA correctly found that the facts in that case "are easily distinguishable from those in the instant case."  (ECF No. 23-5 at 91.)  *See also Caperton*, 556 U.S. at 884–85 (holding that "there is a serious risk of actual bias—based on objective and reasonable perceptions—when a person with a personal stake in a particular case had a significant and disproportionate influence in placing the judge on the case by raising funds or directing the judge's election campaign when the case was pending or imminent").

Additionally, as noted by the WVSCA, Petitioner "failed to identify any evidence of actual prejudice or bias" on the part of the trial judge, (ECF No. 23-5 at 91), that would otherwise make

the failure to file a recusal motion a sign of professional incompetence. Petitioner presented no evidence at the evidentiary hearing in state court that necessitates a finding of ineffective assistance on this ground. Not only does Petitioner fail to present evidence that Mr. Anderson's decision was objectively unreasonable, but also he makes no claim in his objection to the PF&R that filing a motion to recuse before trial would have resulted in a different jury verdict or other outcome. (*See* ECF No. 48 at 5–6.) In light of counsel's overall performance highlighted in other portions of this Memorandum Opinion,[9] there is a "reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Cf. Harrington*, 562 U.S. at 89. As such, the Circuit Court of McDowell County's opinion does not illustrate an unreasonable application of clearly established federal law or an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d); *see also Renico*, 559 U.S. at 773 (citing *Williams*, 529 U.S. at 410) (emphasizing that the Court must focus on whether the state court's application of clearly established federal law was "unreasonable," as opposed to whether it was "correct").

---

[9] The Circuit Court of McDowell County's decision denying Petitioner's state habeas case summarized trial counsel's experience and overall performance in the following passage:

> Petitioner's trial counsel, Mr. Floyd A. Anderson, testified that he was an experienced criminal trial lawyer, had practiced criminal law for 10 years when he tried this case, had been Chief Public Defender for 7 years when he tried the case, had tried 5 murder cases and never had anyone convicted of First Degree Murder without Mercy. He further testified he had tried at least 20 felony cases including murders, rapes, and kidnappings, that he had adequate time to investigate and prepare for trial, employed an experienced investigator to investigate this case, discussed his pretrial and trial decisions in advance with petitioner including petitioner's decision to refuse a plea bargain and take his case to trial, filed and got responses to petitioner's discovery motion, filed a suppression motion, strenuously argued a suppression motion, strenuously argued against admission of Rule 404(b) evidence, called a defense arson expert to counter the State's arson expert, strenuously contested the State's arson evidence, made a tactical decision not to employ a third arson expert (acknowledging that when you hire an expert, you do not always get an opinion that supports your side of the case), strenuously argued that the victim had set the fire by dropping a lit cigarette, called defense witnesses during trial, made appropriate, tactical objections during trial, vigorously cross-examined State witnesses, and argued vigorously on petitioner's behalf.

(ECF No. 23-5 at 3–4.)

Therefore, the Court **OVERRULES** Petitioner's objection as to IAOC based on trial counsel's failure to file a motion to recuse.

### 4. Prosecutorial Misconduct

Petitioner further objects to the PF&R's finding that trial counsel was effective despite the alleged failure "to raise any meaningful objection to the prosecutor's improper hijacking of the sitting circuit clerk as his personal representative in seeking to secure the Petitioner's conviction." (ECF No. 48 at 6.)  Specifically, this relates to two telephone calls that the circuit clerk made in an attempt to instruct a potential witness to call the prosecutor's office.  (*See* ECF No. 23-5 at 89–90, 93 (noting that the circuit clerk, Michael Brooks, actually conversed with the witness' girlfriend, Courtney Prater).)  Petitioner argues that counsel should have "press[ed] the issue before, during, or after trial."  (ECF No. 48 at 6 ("Experienced trial counsel should have hit the roof over such impropriety.").)  The PF&R finds that the state court did not unreasonably apply *Strickland* on this claim because "trial counsel made an oral motion to dismiss based upon the Prosecutor's alleged intimidation of a witness" and because the record did not indicate any prejudice by counsel's alleged failure.  (*See* ECF No. 44 at 32–33.)

After setting out the two-pronged test from *Strickland*, the WVSCA found that "[w]ith regard to [Petitioner's] complaint that Mr. Anderson never raised any issue of prosecutorial misconduct, it appears from the record that he learned of the alleged misconduct shortly before trial and that he did address that issue with the trial court."  (ECF No. 23-5 at 93.)  Accordingly, the standard in § 2254(d) applies.

Mr. Anderson testified as to the following during the state court's evidentiary hearing:

Q. At some point in time, did you become aware of a phone call between Michael Brooks and Ms. Prater?

A. Yes, I did.

Q. And how far in advance of the trial did you find out?

A. That was . . . fairly close to the trial. I'm saying within two weeks of the trial is when I found out about the phone call regarding Michael Brooks.

Q. And once you found out about the phone call, did you file any motions concerning that?

A. No, I did not, but what I did was, at the beginning of the trial, start of the trial, I made a[n] oral motion -- I believe, I think it should be in the transcript -- to dismiss the trial based upon Mr. Brooks tampering with the witness . . . .

(ECF No. 23-4 at 110–11.) A review of the trial transcript shows that Mr. Anderson brought this issue to the trial court's attention and that it was addressed out of the presence of the jury. (*See* ECF No. 50-1 at 92–113.) The trial judge put Ms. Prater on the stand under oath "to get to the bottom" of it, (*id.* at 99), and following her testimony, Mr. Anderson moved to dismiss the indictment against Petitioner, (*id.* at 114 ("[W]e believe that the actions -- the result of it was that a material witness was trying to be intimidated . . . into giving a different statement than what he's going to testify to. We believe that that greatly prejudices the defendant so much. And, based upon that, we would ask that the charges be dismissed . . . .")).

Notwithstanding Petitioner's argument that counsel should have done more with regard to alleged prosecutorial misconduct, the Court does not believe that counsel's performance was objectively unreasonable. *Cf. Stephens v. Branker*, 570 F.3d 198, 212 (4th Cir. 2009) ("Stephens contends that [counsel] should have done more, but he fails to demonstrate that the trial decisions made by his counsel were anything other than tactical judgments."). Counsel testified that he made an oral motion at the start of trial to dismiss the case based on the circuit clerk's attempt to contact Mr. Salyers, which the trial transcript supports, and it could have been counsel's strategy to make the oral motion in lieu of filing a written motion. Petitioner fails to suggest otherwise but instead

claims that counsel should have "hit the roof" after learning of the phone calls.[10] (*See* ECF No. 48 at 6.) Without making judgment as to the appropriateness of the prosecutor's conduct or the phone calls described, the Court finds that the state court did not unreasonably apply *Strickland* in concluding that counsel's performance was not constitutionally deficient in this regard. 28 U.S.C. § 2254(d)(1). Further, the WVSCA did not make an unreasonable determination of the facts in light of the evidence presented. § 2254(d)(2).

Accordingly, the Court **OVERRULES** Petitioner's objection as to IAOC based on a failure "to raise any meaningful objection," (ECF No. 48 at 6), regarding alleged prosecutorial misconduct.

### 5. *Expert Witness and* Daubert *Challenge*

Additionally, Petitioner objects to the PF&R's finding that counsel was effective by arguing that Mr. Anderson "fail[ed] to retain or even consult an expert witness as to the cause of the fire in question, or to question the credentials of the State's experts." (*See id.* at 7–8.) The objection further alleges that trial counsel did not request a *Daubert* hearing to challenge the State's proffered expert and did not meaningfully challenge the State's scientific evidence. (*See id.* at 7 (arguing that "[t]here is no strategic reason in this case for not challenging the State's potential witnesses prior to their testimony before the jury").) Petitioner also objects to the PF&R's suggestion that Mr. James Domingo, one of the State's two arson experts, did not testify as to medical matters. (*See id.* at 7–8.)

The PF&R finds that Petitioner's trial counsel secured Raymond Griffith, who investigated the scene of the fire for an insurance company, to testify on Petitioner's behalf and that Griffith was recognized by the trial court as an arson expert. (*See* ECF No. 44 at 36–37.) The PF&R

---

[10] The Court also notes that these phone calls did not result in any prejudice to Petitioner because, as more fully discussed below, Mr. Salyers ultimately testified favorably to Petitioner at trial.

explains that the decision not to hire an outside arson expert was a strategic decision based on the sufficiency of Griffith's testimony and the uncertainty associated with hiring an outside expert whose determination may be not be favorable. (*See id.* at 37.) As to Petitioner's claim that counsel failed to challenge the State's experts, Mr. Domingo and Robert Bailey, the PF&R states that a *Daubert* challenge was not necessary at trial because there is no claim that the experts' testimony involved "scientific knowledge," a threshold issue for invoking an admissibility argument under *Daubert*. (*See id.* at 39.) Finally, the PF&R finds that Mr. Domingo did not testify as to medical matters—namely, the cause of death of the victim—in the underlying case and, thus, a failure to object to the line of questioning involving the cause of Dr. Whitley's death does not represent ineffective assistance. (*See id.* at 40–41.)

The Circuit Court for McDowell County found that counsel was effective because he "called a defense arson expert to counter the State's arson expert, strenuously contested the State's arson evidence, made a tactical decision not to employ a third arson expert (acknowledging that when you hire an expert, you do not always get an opinion that supports your side of the case), [and] strenuously argued that the victim had set the fire by dropping a lit cigarette." (ECF No. 23-5 at 3–4; *see also id.* at 9–11 (noting that "trial counsel's decision not to seek a third arson opinion before trial was a strategic and tactical decision made by trial counsel").) The WVSCA affirmed the lower court's ruling in finding that "Petitioner's argument that Mr. Anderson failed to hire an arson expert is not supported by the record." (*Id.* at 93.) The court reasoned as follows:

> During the evidentiary hearing, Mr. Anderson testified that he called Raymond Griffith Jr. from Casto Investigation[] to dispute the State Fire Marshall's [sic] opinion as to the cause of the fire. Petitioner also misconstrues the testimony offered by a State arson expert by claiming that the expert offered medical opinion testimony. Based upon our review of the portion of the trial transcript referenced by petitioner, we do not find that to be true. Instead, the expert offered testimony related to the charring, or lack thereof, of the victim's body, which goes to the origin of the fire.

(*Id.*)  Accordingly, § 2254(d) applies to the Court's review.

In analyzing the evidence fundamental to the prosecution's case, defense counsel has a duty to investigate the circumstances and explore all facts relevant to the merits of the case.  *See Rompilla v. Beard*, 545 U.S. 374, 387 (2005).  "A lawyer who fails adequately to investigate, and to introduce into evidence, information that demonstrates his client's factual innocence, or that raises sufficient doubts as to that question to undermine confidence in the verdict, renders deficient performance."  *Reynoso v. Giurbino*, 462 F.3d 1099, 1112 (9th Cir. 2006) (quoting *Lord v. Wood*, 184 F.3d 1083, 1093 (9th Cir. 1999)); *see also Wiggins v. Smith*, 539 U.S. 510, 527 (2003) (noting that "*Strickland* does not establish that a cursory investigation automatically justifies a tactical decision").  The failure to retain an independent expert will not automatically result in ineffective assistance if counsel "effectively subjected the [state's] evidence to adversarial testing."  *See Yarbrough v. Johnson*, 520 F.3d 329, 336–37 (4th Cir. 2008) (noting that the petitioner's ineffective assistance claim on this ground "rested on nothing more than the petitioner's 'hope or suspicion'" that an additional expert would help his case); *see also Dugas v. Coplan*, 428 F.3d 317, 328–30 (1st Cir. 2005) (finding counsel's representation deficient because while the circumstances created an "inescapable need for expert consultation," counsel did not consult an arson expert as part of his investigation "for reasons he was unable to explain").  Conversely, simple consultation with an outside expert, without more, may not render counsel's performance effective. *See Richey v. Bradshaw* 498 F.3d 344, 362–63 (6th Cir. 2007).  For example, in *Richey*, the Sixth Circuit held that trial counsel was deficient for consulting with an arson expert who agreed with the prosecution's conclusion as to the cause of the fire and failed to question the expert's rationale before abandoning any possible defense based on that expert's opinion.  *See id.* ("A lawyer cannot be deemed effective where he hires an expert consultant and then either

willfully or negligently keeps himself in the dark about what that expert is doing, and what the basis for the expert's opinion is.").

Petitioner's trial counsel, Mr. Anderson, called Raymond Griffith as a defense witness during trial. Mr. Griffith was a fire investigator for Casto Investigation and had worked there for four-and-a-half years at the time of his testimony. (ECF No. 23-10 at 247.) He testified that before working for Casto Investigation, he was a retired battalion chief with the Charleston Fire Department, having worked there for twenty-nine years. (*Id.*) Before becoming battalion chief, he was the City of Charleston's fire investigator for thirteen years. (*Id.*) Mr. Griffith stated that he investigated on average "about 160 fires per year" during those thirteen years and averaged between forty and fifty fires per year while at Casto Investigation. (*Id.*) After no objection from the prosecution, Mr. Griffith was qualified and recognized by the court as an expert in the field of "fire examination." (*Id.* at 248.) Thus, insofar as Petitioner argues in his objection that defense counsel put forth no expert witness on his behalf and that "[t]he jury was presented with only the State's perspective," (*see* ECF No. 48 at 7), the trial record indicates otherwise.[11] It bears no difference on the ineffective assistance analysis if the witness investigated the home as part of an insurance examination and report or as an expert independently retained by the defense. The issue turns on the relevant facts that defense counsel called Mr. Griffith to testify as an expert and that Mr. Griffith's report and testimony concluded that the cause of the fire was "undetermined," which

_____

[11] The Court notes that the prosecution initially obtained Mr. Griffith's report through the State Fire Marshal's Office, which requested a copy of the report. (*See* ECF No. 23-10 at 264.) The prosecution then turned over the report to Petitioner's counsel. (*See id.*) While defense counsel received the report through the State, Mr. Griffith did not conduct his examination on behalf of the State. (*See id.* at 247.) Rather, Mr. Griffith investigated the scene of the fire at the request of an insurance company through his position at Casto Investigation. (*See id.*) Because Mr. Anderson felt that Mr. Griffith's report was sufficient to rebut the State's conclusion as to the fire's cause, counsel called Mr. Griffith to testify on Petitioner's behalf. (*See* ECF No. 23-4 at 117–18.) The fact that the State initially gave defense counsel a copy of the report as a matter of course is irrelevant and does not support the notion that Mr. Griffith's expert testimony encapsulates "the State's perspective" as Petitioner seems to argue. (*See* ECF No. 48 at 7.) The State had its own experts at trial whose conclusions as to the cause of the fire did not comport with that of Mr. Griffith, who was called to testify by defense counsel.

was contrary to the conclusions of the State's experts. (*See* ECF No. 23-10 at 259–60 ("I did not rule that it was arson.").)

The Court finds that counsel's decision to put Mr. Griffith on the witness stand in lieu of hiring an independent arson expert was a strategic choice. Counsel read Mr. Griffith's report approximately a month prior to trial and contacted him to testify. (*See id.* at 263–64.) Mr. Anderson was asked at the state habeas proceeding's evidentiary hearing about his decision not to retain an outside expert. He testified that he spoke with Mr. Griffith "several different times before . . . trial" and that "based upon his findings, . . . the [cause of] the fire was undetermined." (*Id.* at 116–17.) Mr. Anderson felt that using Mr. Griffith's report and questioning him about his findings was sufficient for purposes of rebutting the State's evidence as to the cause of the fire. (*See id.*) Because it appears that defense counsel investigated the law and facts and made a strategic choice to call Mr. Griffith as an expert witness instead of retaining an additional expert witness, the decision represents the type that the *Strickland* Court deemed "virtually unchallengeable." *See* 466 U.S. at 690; *see also Dugas*, 428 F.3d at 328–29 (citing *Miller v. Anderson*, 255 F.3d 455, 459 (7th Cir. 2001)) (recognizing that "reasonably diligent counsel are not always required to consult an expert as part of pretrial investigation in a case involving the use of expert witnesses by the state").

Despite not retaining an additional outside arson expert, defense counsel put the State's evidence to adversarial testing by advancing a theory that arson was not the cause of the fire. Based on trial counsel's own investigation of the facts, he developed the following theory as a defense to arson:

> I think it was clear that Doc was left at home by himself. He was a smoker. Everyone knew he was a smoker. I think he even had an ashtray on his bed. I mean, there [were] cigarette butts everywhere. He smoked.

> They left him home, a quadriplegic at home, by himself, alone, smoking cigarettes. They knew he was alone. They knew he couldn't get up.

(ECF No. 23-4 at 135; *see also id.* at 133 (stating that Petitioner did not oppose the use of this strategy).) On cross-examination at the evidentiary hearing, the prosecutor stated the following as to defense counsel's not-arson theory:

> Q. And that was argued at trial . . . whether it was arson or whether it was accidental; correct?
>
> A. Yes.
>
> Q. And did the defense at trial argue that it could have -- the fire could have resulted as a result of a dropped cigarette?
>
> A. Yes. That was argued very strenuously, that Dr. Whitley was a smoker and he did smoke in that bedroom and it could have caused that.

(*Id.* at 58.) Therefore, not only did defense counsel put an arson expert on the stand whose conclusion counsel believed aided Petitioner's case, but also counsel advanced a stringent defense against the prosecution's case regarding the cause of the fire. The Court agrees with the PF&R that any argument regarding the probative value of an outside defense expert in this case is speculative. (*See* ECF No. 44 at 37.) In finding that counsel's performance was not ineffective for failing to provide an arson expert, the WVSCA did not unreasonably apply the *Strickland* standard or make an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d).

As to Petitioner's claim regarding trial counsel's failure to challenge the State's experts under *Daubert*, this argument is foreclosed by the inapplicability of *Daubert* to the testimony proffered by the experts in this case. The Supreme Court in *Daubert* instructed courts to make a "'preliminary assessment of whether the reasoning or methodology' underlying expert testimony 'is scientifically valid.'" *Freeman v. Case Corp.*, 118 F.3d 1011, 1016 n.6 (4th Cir. 1997) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 590 n.8 (1993)). However, where an expert

relies on experience and training and not a particular scientific methodology to reach his conclusions, the application of *Daubert*'s analysis is not triggered.  *See id.* (citations omitted).  For example, the Fourth Circuit has held that where an expert's conclusions regarding the cause of a residential fire were based "upon his 'experience and training' as an electrical engineer with approximately 25 years of experience investigating fires[,] . . . the *Daubert* analysis [was] simply inapplicable to a determination of the admissibility of [his] testimony."  *Talkington v. Atria Reclamelucifers Fabrieken BV*, 152 F.3d 254, 265 (4th Cir. 1998), *cert. dismissed*, 525 U.S. 1062. The WVSCA also held as recently as last year that the admissibility of arson expert testimony in state courts "would be assessed under Rule 702 of the West Virginia Rules of Evidence as evidence based on technical or specialized knowledge—and not under *Daubert/Wilt*."  *See Anstey v. Ballard*, 787 S.E.2d 864, 881 (W. Va. 2016) (citing *State v. McCracken*, 624 S.E.2d 537 (W. Va. 2005)) (rejecting the petitioner's argument that "his due process rights were violated because the investigative techniques used during the investigation of the subject fire would not be admissible at trial today, under a *Daubert/Wilt* analysis, since fire investigations have become 'scientific'"); *see also* Syl. pt. 2, *Wilt v. Buracker*, 443 S.E.2d 196 (W. Va. 1993); *cf. Watson v. Inco Alloys Int'l, Inc.*, 545 S.E.2d 294, 299–300 (W. Va. 2001) (finding that the engineering expert witness "did not base his testimony on any type of testing that utilized the scientific method" but that, rather, the opinion "was based on his education, years of experience, review of over one thousand accidents . . . , and his review of reports").

The WVSCA did not directly address the *Daubert* issue in its ruling despite the claim's inclusion in Petitioner's memorandum in support of his state habeas petition.  (*See* ECF No. 23-3 at 18.)  However, the court applied the *Strickland* standard in finding that Petitioner's counsel was effective, in part, because he "strenuously contested the State's arson evidence . . . ."  (ECF No.

23-5 at 93.) As explained above with regard to the issue of counsel's failure to file a motion to recuse, the standard set out in § 2254(d) still applies where the state court does not explain its rationale on a specific claim. *See Weeks*, 176 F.3d at 259.

The result reached by the WVSCA on the *Daubert* issue was not in error. Because the *Daubert* analysis is irrelevant to the technical or specialized expert testimony of Mr. Domingo and Mr. Bailey[12] and state courts do not apply the Federal Rules of Evidence, Petitioner's objection

---

[12] These two individuals were called by the State to testify regarding their investigation of the fire at Dr. Whitley's residence. Both individuals based their testimony on vast technical and specialized knowledge regarding fire investigation and the origin and cause of fires.

First, Mr. Domingo stated that for the past twelve years he had served as an Assistant State Fire Marshal for the West Virginia State Fire Marshal's Office, for which he "primarily [did] origin and cause investigation," and previously was a volunteer firefighter for twenty-six years, holding the positions of lieutenant and, for the last seven years, assistant chief, fire prevention officer, and training officer. (*See* ECF No. 50-2 at 284.) As for training, Mr. Domingo testified that he received training from the Bureau of Alcohol, Tobacco, Firearms and Explosives on fire and explosive investigation and attended the following: a federal law enforcement center in Georgia for training on "fire and explosives, the chemistry of fire, fire behavior, collection of evidence, documentation of fire scenes[,] and explosive scenes;" the FBI Academy for fire explosive investigation training; the National Fire Academy for fire investigation training including "origin and cause work, fire behavior, [and] chemistry of fire;" and "multiple classes throughout [] the United States on fire investigation and explosive investigation." (*See id.* at 284–86.) He stated that of the approximately 1,200 fire scenes he had investigated, most "involve[d] places of habitation, either single family dwellings, duplexes, [and] apartment buildings." (*Id.* at 287.) Mr. Domingo then detailed his investigation of the scene at Dr. Whitley's house, providing that he began with a look around the structure's exterior before going inside. (*See id.* at 288–89.) He stated that the fire damage was confined to the living room and Dr. Whitley's bedroom and that "there wasn't a lot of damage on the outside of the house . . . ." (*See id.* at 289–90.) All of Mr. Domingo's testimony was solicited based on his observations and experience investigating fires; at no point was he asked for a scientific opinion. (*See, e.g.*, *id.* at 319 ("Q. Based on your actual inspections and examinations at the scene and your education, training and experience, were you able to reach a conclusion and opinion as to the cause and origin of this fire?").)

Second, Mr. Bailey testified that he had worked for the West Virginia State Fire Marshal's Office for two-and-a-half years and had been a volunteer firefighter for ten-and-a-half years. (ECF No. 23-10 at 11–12.) In terms of training, Mr. Bailey stated that he had two weeks of training at the National Fire Academy, an eighty-hour course on fire investigation, another eighty-hour course on explosives investigation and blast investigation, and training in the following fields: "vehicle fire investigation; fatal fire investigation; electrical fire investigation; training as a firefighter; and fire suppression and fire suppression efforts . . . ." (*Id.* at 12–13.) Mr. Bailey's primary duties as Assistant State Fire Marshal involved conducting fire investigations to determine the "origin and cause of fires in residences, businesses, vehicles[, and] even wild lands." (*Id.* at 13.) In the two-and-a-half years he had worked for the Fire Marshal's Office, he testified that he was the lead investigator on over 280 fire scenes. (*Id.* at 13, 51–52.) Mr. Bailey further testified that after being paged the morning of the fire in Iaeger, he immediately went to the scene and spoke with Iaeger fire chief and other firefighters on scene "to find out what they first found when they first arrived on the scene, what their efforts were when they first arrived, what did they do first, how did they do it, where did they make entry, where did they discover a body, things like that." (*Id.* at 15.) Mr. Bailey then conducted his own investigation by observing the scene, taking photographs and measurements, and documenting his findings beginning outside and working his way inside the residence. (*See id.* at 15–27.)

As emphasized in their testimonies, Mr. Domingo and Mr. Bailey relied on their background and experience as firefighters and investigators to opine as to the origin and cause of the fire in this case. Their testimonies were not

regarding counsel's failure to challenge the admissibility of the State's expert testimony lacks merit.[13]  *See Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."); *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) (noting that "federal habeas corpus relief does not lie for errors of state law").  Although the WVSCA did not explain its reasoning on this particular claim, an independent review of the record and pertinent law reveals that trial counsel did not employ unreasonable judgment by not requesting a *Daubert* hearing.  *See Bell*, 236 F.3d at 163.  Accordingly, the result reached by the WVSCA on this point did not involve an unreasonable application of federal law nor was it based on an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d).

Finally, Petitioner objects to the PF&R's "suggest[ion] that when Mr. Domingo testified as to his agreement with the medical examiner's office as to the cause of death . . . this was not testimony as to medical matters."  (ECF No. 48 at 7–8.)  The WVSCA considered this issued in the state habeas matter and wrote as follows:

> Petitioner also misconstrues the testimony offered by a State arson expert by claiming that the expert offered medical opinion testimony.  Based upon our review

based on a particular methodology or the scientific method.  Thus, the *Daubert* analysis does not apply to the admissibility of their testimonies.  *See Talkington*, 152 F.3d at 265; *Anstey*, 787 S.E.2d at 881.

[13] Petitioner similarly attempts to argue in his objections that, *Daubert* aside, counsel was ineffective "for not challenging the State's potential witnesses prior to their testimony before the jury, or to at least explore their testimony under questioning . . . ."  (ECF No. 48 at 7.)  The above analysis indicates that had counsel challenged the admissibility of the State's expert witnesses, the state court would have conducted its analysis under West Virginia Rule of Evidence 702.  *See McCracken*, 624 S.E.2d at 541–42 (finding no abuse of discretion in admitting fire investigator's testimony under Rule 702, noting that he was a firefighter for more than forty years, was retired lead fire investigator, and served as a consultant in fire and arson investigations).  Again, this Court does not examine alleged errors based on state law when conducting a habeas review under § 2254.  *See Lewis v. Jeffers*, 497 U.S. 764, 780 (1990).

Regarding Petitioner's one-line general comment that counsel failed "to at least explore [the experts'] testimony under questioning," (ECF No. 48 at 7), the Court does not find any unreasonable application of federal law in the WVSCA's finding that counsel was effective for "strenuously contest[ing] the State's arson evidence . . . ." (ECF No. 23-5 at 93.)  A review of the trial transcript reveals that during the testimonies of the State's experts, Mr. Domingo and Mr. Bailey, counsel made no fewer than a half-dozen objections during the testimony and introduction of exhibits related to the investigations, and counsel competently cross-examined the State's experts for a combined sixty-three pages of the trial transcripts.  (*See* ECF No. 23-10 at 6, 10, 27, 42–43, 46, 50, 51–93; ECF No. 50-2 at 321–46.)  As such, the Court does not find that Mr. Anderson was deficient for failing to challenge the State's expert testimony at trial.

of the portion of the trial transcript referenced by petitioner, we do not find that to be true. Instead, the expert offered testimony related to the charring, or lack thereof, of the victim's body, which goes to the origin of the fire.

(ECF No. 23-5 at 93.) The PF&R agrees with the WVSCA's determination that Mr. Domingo "merely opined that the medical examiner's findings was [sic] consistent with his observations of the fire scene" and that trial counsel was not ineffective by not objecting to such testimony. (*See* ECF No. 44 at 40–41.)

While Petitioner does not point the Court to a specific line of questioning from the expert's testimony, the following excerpt from the direct examination of Mr. Domingo appears to be what Petitioner references:

Q. Would it have been important in the total investigation to know what actually caused Dr. Whitley's death?

A. Would it have been important? It would have been important yes, sir.

Q. If the medical examiner found that Dr. Whitley was alive and breathing while the fire was burning and his death was attributed to smoke inhalation and the high level of [carbon dioxide] I believe is what he described within his blood, would that be consistent with your observations at the scene?

A. Yes.

Q. The fact that Dr. Whitley was not directly burned by flames from the fire -- according to the medical examiner, he was close to the fire and source of considerable heat and not actually -- his flesh was not actually burned by the flames themselves, would that have -- would that be a significant factor in your determination?

A. Yes. Usually -- and I remember speaking to the other fire marshals that were there and the firemen that viewed the body as to the condition of the body because that's something important to me.

Q. In fact you saw photographs of Dr. Whitley before his body was removed?

A. I seen --

Q. You didn't see the photographs before he was removed. You saw the photographs that were taken before his body was removed?

A. That's correct.

Q. Did they substantiate what I represented to you, that he had heat burn or thermal burns on his body but his body was not actually charred or burned by the flames of the fire itself?

A. Correct.  Very well intact as some of the clothing he had on.  Very well intact.

(ECF No. 50-2 at 317–18.)

Clearly, Mr. Domingo did not offer an opinion as to the cause of Dr. Whitley's death.  He testified that it would be important to his investigation to know what caused the death, and he answered in the affirmative that a medical determination that Dr. Whitley was alive and breathing while the fire burned would be consistent with his observations.  (*See id.*)  Further, he simply stated his observation that neither Dr. Whitley's clothing nor his body was charred or burned by the fire itself.  (*See id.*)  The Court does not find that this is "[t]estimony as to the cause of death," which Petitioner considers "medical opinion."  (ECF No. 48 at 8.)  Mr. Domingo was never asked his opinion regarding the cause of death—which the Court notes would have been an inappropriate line of questioning given Mr. Domingo's expertise in fire investigation and not medical science— and he never unilaterally provided such an opinion.  Therefore, Petitioner's objection regarding this finding within the PF&R has no merit, and the WVSCA did not unreasonably apply federal law or make an unreasonable determination of the facts in its decision on this final issue regarding the arson experts.  28 U.S.C. § 2254(d).

For these reasons, the Court **OVERRULES** Petitioner's objection as to IAOC based on the failure to retain an outside expert or meaningfully challenge the State's expert witnesses.

### 6. *Hearsay, Confrontation Clause, and Potentially Exculpatory Evidence*

Sixth, Petitioner generally objects to the PF&R's finding that both trial and appellate counsel were effective despite their "failure, at various times and in various ways, to develop,

preserve, and raise the issues of hearsay, the Confrontation Clause, and potentially exculpatory evidence." (ECF No. 48 at 8.) Petitioner again draws attention to what he characterizes as the WVSCA's "reference to these lapses and their significance," but, notably, the state court did not find the "lapses" to be of the type that rendered counsel ineffective. (*See* ECF No. 23-5 at 93–94 (applying the *Strickland* standard and holding that Petitioner "did not receive ineffective assistance of counsel in his criminal proceeding or in his direct appeal").) In this objection, Petitioner does not direct the Court to any specific errors,[14] and he does not raise any new information, such as new evidence or a new argument. *See Cruz v. Marshall*, 673 F. App'x 296, 299 (4th Cir. 2016) (per curiam) (unpublished opinion) (noting that when new information is raised in an objection, "the district court must do more than simply agree with the magistrate"). Petitioner simply and generally notes that due to errors related to "hearsay, the Confrontation Clause, and potentially exculpatory evidence" made "at various times and in various ways" throughout the pendency of the underlying criminal case and appeal, Magistrate Judge Aboulhosn's finding as to each counsel's effectiveness is improper. Without specific objections, however, the Court does not conduct a *de novo* review as it has elsewhere throughout this memorandum opinion. *See Orpiano*, 687 F.2d at 47 (noting that a court need not conduct a *de novo* review when the petitioner "makes general and conclusory objections that do not direct the court to a specific error" in the PF&R).[15] The Fourth Circuit has been clear that "[i]n order 'to preserve for appeal an issue in a magistrate

---

[14] The Court notes that Petitioner is represented by counsel in this matter, so the claims put forth in his objections are not liberally construed as they otherwise would be if he were a *pro se* litigant. *See United States v. Wilson*, 699 F.3d 789, 797 (4th Cir. 2012) (citing *Boag v. MacDougall*, 454 U.S. 364 (1982) (per curiam)).

[15] *See also* 28 U.S.C. § 636(b)(1) ("A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions."); Fed. R. Civ. P. 72(b)(3) ("The district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to. The district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions.").

judge's report, a party must object to the finding or recommendation on that issue with sufficient specificity so as reasonably to alert the district court of the true ground for the objection.'" *Martin v. Duffy*, 858 F.3d 239, 245 (4th Cir. 2017) (quoting *United States v. Midgette*, 478 F.3d 616, 622 (4th Cir. 2007)). Without more, the Court finds no support for the proposition that the state court unreasonably applied federal law or made an unreasonable determination of the facts on this claim. 28 U.S.C. § 2254(d). Accordingly, the Court **OVERRULES** the objection.

### 7. Cumulative Failure by Trial and Appellate Counsel

Similar to the previous objection, Petitioner makes a general objection that the PF&R erred in its determination that trial and appellate counsel were effective "based on the failure and lapses noted above, the cumulative effect of which was to deprive the Petitioner of any opportunity to subject the State's case to adversarial testing." (ECF No. 48 at 8.) The Court at this point has examined each of Petitioner's other objections regarding IAOC and found them to be without merit. This conclusory objection purports to persuade the Court that despite any finding with regard to the other specific objections, it can still find that the cumulative effect of those alleged errors resulted in IAOC. However, the Fourth Circuit has explicitly rejected this type of argument. *See Fisher v. Angelone*, 163 F.3d 835, 852–53 (4th Cir. 1998) (holding that a "legitimate cumulative-error analysis evaluates only the effect of matters actually determined to be constitutional error"), *cited in Mueller v. Angelone*, 181 F.3d 557, 586 n.22 (4th Cir. 1999) ("Petitioner also urges us to consider the *cumulative* effect of his ineffective assistance of counsel claims rather than whether each claim, considered alone, establishes a constitutional violation. This argument is squarely foreclosed by our recent decision in *Fisher . . . .*" (emphasis in original)). The Court finds that this cumulative errors objection is of a general and conclusory nature, and based on *Fisher* and *Orpiano*, the Court **OVERRULES** the objection.

### B. Witness Intimidation and Prosecutorial Misconduct

Next, Petitioner objects to the PF&R's conclusion that Respondent is entitled to summary judgment as to Grounds 3 and 4 of the § 2254 Petition. (*See* ECF No. 48 at 8–10; ECF No. 20 at 16–28.) The objection disputes the PF&R's finding based on "the prejudicial effect of the prosecuting attorney's use of the sitting clerk as his personal employee, representative, communicant, and aide in securing the conviction of a defendant before the very court for whom the clerk worked." (ECF No. 48 at 8.) Specifically, Petitioner is alluding to two phone calls that the county circuit clerk, Michael Brooks, made in an attempt to contact a government witness, Brian Salyers, after the prosecutor on the case, Sidney Bell, told Mr. Brooks about the trouble he was having making contact with Mr. Salyers in preparation for trial. (*See* ECF No. 23-4 at 15–16.) Mr. Brooks told Mr. Bell that he was a family friend and could try to contact Mr. Salyers. (*See id.* at 15.) When Mr. Brooks made the phone calls to Mr. Salyers' residence, he instead spoke with Mr. Salyers' girlfriend, Courtney Prater. (*See id.* at 19.) Petitioner characterizes the circuit clerk as "a handmaiden of the court" and argues that, therefore, "a representative of the court itself attempted to help secure the Petitioner's conviction by contacting a potentially recanting witness to ensure his availability to the prosecution and to warn him of the consequences of recanting." (*See* ECF No. 48 at 9 (describing this action as "blatant, unapologetic witness tampering").) Petitioner also objects to the PF&R's finding that because Mr. Brooks spoke with Ms. Prater and not Mr. Salyers, "there could be no imputation of interference with the witness himself." (*Id.*; *see also* ECF No. 44 at 55–57.)

The Circuit Court of McDowell County found no violations of Petitioner's rights with regard to prosecutorial misconduct or witness intimidation. (*See* ECF No. 23-5 at 5–6.) The court noted that Mr. Brooks acted in his personal capacity in attempting to contact Mr. Salyers and never

actually spoke to the witness.  (*Id.* at 5.)  It emphasized that Mr. Brooks only spoke with Ms. Prater and that, in her testimony, she stated "that she did not know that Mr. Brooks was ever the Circuit Clerk."  (*Id.* at 5–6 ("No authority was cited, nor none given, that would make any of this communication between the Circuit Clerk and the girlfrie[n]d of a witness a prohibited communication.").)  Finally, the court held that even though there was no evidence of impropriety by Mr. Bell or Mr. Brooks, "[t]he witness appeared at trial and testified favorably to the petitioner." (*Id.* at 6.)

After setting out the standard of review in habeas cases, the WVSCA addressed these two issues of alleged witness intimidation and prosecutorial misconduct.  (*See id.* at 89–90.)  The court recognized that Petitioner raised these issues at trial but did not claim them in his direct appeal, and it disagreed with Petitioner's contention that the they rose to the level of a constitutional issue. (*Id.* at 90 ("As set forth above, a habeas corpus proceeding is not a substitute for a writ of error, and only errors involving constitutional violations will be reviewed.").)  Thus, the WVSCA found that there was no due process violation as Petitioner now claims.

Upon review of the record in this case, the PF&R finds that "the Prosecutor did not suborn or intimidate a witness" and that even if improper conduct occurred, "there is no indication that the Prosecutor's conduct prejudicially affected Petitioner's substantial rights so as to deprive Petitioner of a fair trial."  (ECF No. 44 at 55–56 (noting that Mr. Salyers testified favorably to Petitioner at trial).)  Further, the PF&R finds that the government did not substantially interfere with the witness' "free and unhampered choice to testify" because Mr. Brooks did not directly communicate with the witness and, according to Ms. Prater's testimony, did not make any type of threat during the conversation.  (*See id.* at 56–57.)  Based on these findings, the PF&R does not take issue with the WVSCA's conclusion.

In finding that the allegations of witness intimidation and prosecutorial misconduct were not "errors involving constitutional violations," the WVSCA failed to provide a rationale for that conclusion. (*See* ECF No. 23-5 at 90 ("[A] habeas corpus proceeding is not a substitute for a writ of error, and only errors involving constitutional violations will be reviewed. Therefore, we decline to address the portions of the first and fourth assignments of error related to the communication issues and any alleged prosecutorial misconduct related to the same.").) Again, in this situation, the standard set forth in 28 U.S.C. § 2254 still applies, but the Court will "look through" the WVSCA's summary decision on this claim and treat the Circuit Court of McDowell County's opinion as the basis for the § 2254(d) analysis. *See Brumfield*, 135 S. Ct. at 2276; *Grueninger*, 813 F.3d at 525–27.

A fundamental element of due process is the defendant's right to present witnesses in his defense. *See Washington v. Texas*, 388 U.S. 14, 19 (1967). This right may be violated through alleged intimidation if it amounts to "substantial government interference with a defense witness' free and unhampered choice to testify." *See United States v. Saunders*, 943 F.2d 388, 392 (4th Cir. 1991) (internal quotation marks omitted) (citations omitted), *cert. denied*, 502 U.S. 1105 (1992). Further, due process rights are violated when, through the actions of the court, a defense witness is effectively driven off the stand. *See United States v. Teague*, 737 F.2d 378, 382–83 (4th Cir. 1984) (citing *Webb v. Texas*, 409 U.S. 95, 98 (1972)).[16] However, absent "intimidation or

---

[16] The Supreme Court found a due process violation in *Webb* because the trial judge, on his own initiative, admonished the witness in open court by the following statements:

> Now you have been called down as a witness in this case by the Defendant. It is the Court's duty to admonish you that you don't have to testify, that anything you say can and will be used against you. If you take the witness stand and lie under oath, the Court will personally see that your case goes to the Grand Jury and you will be indicted for perjury and the liklihood [sic] is that you would get convicted of perjury and that it was [sic] be stacked on to what you have already got, so that is the matter you have got to make up your mind on. If you get on the witness stand and lie, it is probably going to mean several years and at least more time that you're going to have to serve. It will also be held against you in the pentitentiary [sic] when you're up for parole and the Court wants

threatening of the witness by the court" or "any agent of the government," courts have difficulty concluding that witness intimidation occurred. *See Teague*, 737 F.2d at 384. Further, where a witness actually testifies and gives "all of the favorable testimony that the defendant could have expected," the defendant will not have suffered any prejudice from the alleged intimidation that requires relief. *See id.*

As to prosecutorial misconduct, the petitioner must show "(1) that the prosecutor's remarks and conduct were, in fact, improper and (2) that such remarks or conduct prejudiced the defendant to such an extent as to deprive the defendant of a fair trial." *United States v. Allen*, 491 F.3d 178, 191 (4th Cir. 2007) (citing *United States v. Golding*, 168 F.3d 700, 702 (4th Cir. 1999)); *see also Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (noting that the court's determination of prosecutorial misconduct relies on "whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process" (internal quotation marks omitted) (citation omitted)). "[T]he Supreme Court has clearly indicated that the state courts have substantial breathing room when considering prosecutorial misconduct claims because constitutional line drawing [in cases of prosecutorial misconduct] is necessarily imprecise." *Slagle v. Bagley*, 457 F.3d 501, 516 (6th Cir. 2006) (citing *Donnelly v. DeChristoforo*, 416 U.S. 637, 645 (1974)). Ultimately, improper conduct by the prosecutor that deprives the defendant of a fair trial will result in reversible misconduct. *See United States v. Francisco*, 35 F.3d 116, 120 (4th Cir. 1994), *cert. denied*, 513 U.S. 1133 (1995); *see also United States v. Caro*, 597 F.3d 608, 624–25 (4th Cir. 2010).

---

you to thoroughly understand the chances you are taking by getting on the witness stand under oath. You may tell the truth and if you do, that is all right, but if you lie you can get into real trouble. The Court wants you to know that. You don't owe anybody anything to testify and it must be done freely and voluntarily and with the thorough understanding that you know the hazard you are taking.

*Teague*, 737 F.2d at 382–83 (first "[sic]" in original) (quoting *Webb*, 409 U.S. at 98).

Here, Petitioner's state habeas counsel questioned the prosecutor, Mr. Bell, at the evidentiary hearing. Mr. Bell testified that the potential witness, Mr. Salyers, submitted to a polygraph test as well as a recorded interview with law enforcement where he "admitted to facts that incriminated Mr. Lively and Mr. Owens." (*See* ECF No. 23-4 at 32–33.) After listening to the recording of the interview, Mr. Bell unsuccessfully attempted to reach Mr. Salyers. (*Id.* at 34.) Mr. Bell found it odd that Mr. Salyers would not respond to telephone calls, and he asked two deputy sheriffs to go to Mr. Salyers' residence because he was concerned that Mr. Salyers was "trying to dodge [him] or not wanting to talk" before trial. (*See id.*) Mr. Bell testified that he was not aware of any intention by Mr. Salyers to recant the story he originally told to law enforcement. (*See id.* at 35; *see also id.* at 39 (answering in the negative when asked if he told Mr. Brooks to ask Mr. Salyers "why he was recanting or changing his story").) Mr. Bell further stated that after expressing concern to Mr. Brooks that Mr. Salyers did not want to talk, Mr. Brooks said "that he was acquainted with Mr. Salyers' mother and the family, and that he would attempt to contact them, or him, and ask him to come in and meet" with Mr. Bell. (*See id.* at 37.) According to Mr. Bell, Mr. Salyers' mother attended church where Mr. Brooks, a preacher, conducted services. (*See id.*) When questioned if he asked Mr. Brooks to call Mr. Salyers' family, Mr. Bell stated the following: "The way I would characterize it is he told me he could; he knew them; and I said, 'Well, would you do that and see if he will come and meet with me?'" (*Id.* at 37–38; *see also id.* at 39 ("Q. What precisely did you tell [Mr. Brooks] to do in regard to that phone call? A. To ask Brian Salyers to come in and talk with me or arrange for me to meet with Brian Salyers to talk with him before the trial.").) Mr. Bell stated that he "asked [Mr. Brooks] to do it as a friend of the family," (*id.* at 53), and that he did not instruct Mr. Brooks to warn Mr. Salyers or his family "about the possible consequences of him testifying a certain way . . . ." (*Id.* at 39–40.)

Ms. Prater also testified at a hearing during the trial as to two telephone conversations she had with Mr. Brooks and confirmed that, to her knowledge, Mr. Brooks never spoke with Mr. Salyers. (*See id.* at 80, 82 (stating that during the second call, Mr. Salyers walked in "mid-way through the conversation").) Mr. Salyers corroborated that he never spoke with Mr. Brooks. (*See id.* at 91 ("I listened to [Mr. Brooks] on speaker phone. I never spoke directly with him. He didn't think I was there.").) Ms. Prater did not know what Mr. Brooks' "official employment" was at the time of the phone call, and she said that she never became aware that he was circuit clerk. (*See id.* at 81–82 (disclosing that she knew Mr. Brooks was at one point the county sheriff).) As to Petitioner's claim of witness intimidation, the following exchange occurred on Ms. Prater's direct examination:

> Q. During that first conversation, did Mr. Brooks intimidate you or threaten you?
>
> A. He didn't -- he never threatened me and, as far as the intimidation factor is concerned, when all this was taking place, when the incident actually occurred was, I believe, I was in high school. I had absolutely nothing to do with any of it. So a lot of it was extremely intimidating.
>
> Q. During the course of the conversation with Mr. Brooks, did you feel intimidated during the first conversation or the second conversation?
>
> A. I felt intimidated through mostly all of it.
>
> . . .
>
> A. The majority of the reason that I felt intimidated was due to the fact that [] I had absolutely nothing to do with this. I was 19 years old at the time and was being brought into something that didn't really concern me. *It wasn't so much the person that I felt intimidated by.* It was actually the whole circumstance surrounding it.

(*Id.* at 83–84 (emphasis added).) Similarly, Mr. Salyers' testimony at the evidentiary hearing supports the notion that the statements made by Mr. Brooks were not overtly threatening or intimidating in nature. (*See id.* at 92 ("Q. At any point in time, did he ever -- did he ever indicate

that you would have problems?  A. Just -- not really, not coming out and saying it . . . .").  *But see id.* at 97 ("Q. Given the situation at the police station and the phone calls made to your home, did you feel threatened in any way?  A. Yes, sir.").)

Notwithstanding the phone calls between Mr. Brooks and Ms. Prater and the fact that Mr. Salyers listened to part of the second conversation, Mr. Salyers still spoke with the defense investigator and testified at trial favorably to Petitioner:

> Q. So you made Mr. Anderson aware that you were going to change your testimony?
>
> A. Yes, sir.
>
> Q. And in relation to the trial, was that months prior to?
>
> A. Whenever I talked to him, yeah . . . I didn't hide it that I wasn't going to say what they -- what I told the cops that night.  I told them that I didn't let [Mr. Lively] off.  I didn't see [Mr. Lively and Mr. Owens] that morning.
>
> . . .
>
> Q. And when you testified at trial, despite the fact that you say your girlfriend said Deputy Auville had said something and Michael Brooks had called and you had listened to one of the -- part of one of his conversations on the speak[er] phone, you testified consistent with the statement you had given to Mr. Anderson's investigator, Mr. Wolfe?
>
> A. Yes.
>
> Q. And basically admitted at trial that everything you had told the police, except for the part about Mr. Owens and Mr. Lively, the rest of it was true but that part wasn't true?
>
> A. Yes, sir.

(*Id.* at 96, 101.)

The evidence in the record shows that Mr. Brooks' attempts to contact Mr. Salyers and tell him to reach out to the prosecutor's office did not involve substantial government interference with Mr. Salyers' choice to testify.  *Cf. Saunders*, 943 F.2d at 392.   Unlike the witness in *Webb*,

Mr. Salyers was not driven off the stand, nor was the substance of his testimony influenced by the attempted contact. *See Teague*, 737 F.2d at 382–83 (citing *Webb*, 409 U.S. at 98). Mr. Salyers recanted part of his original statement to law enforcement on the stand and testified favorably to Petitioner.[17] As the above excerpts from both the evidentiary hearing transcript and trial transcript

---

[17] The following testimony was elicited from Mr. Salyers at trial:

> Q. Now, these police officers clearly asked you to tell them what happened the morning of the fire at Dr. Whitley's house between you and Tommy Owens and Jason Lively. Isn't that what they wanted to know?
>
> A. Yes, they did.
>
> Q. And you told them in a tape recorded interview that that morning you saw [Mr. Owens and Mr. Lively] at the Super Stop convenient store on your way to sell the copper, they asked you to give them a ride and you gave them a ride and dropped them off at Dr. Whitley's clinic that morning at about eight o'clock; isn't that true?
>
> A. Yes. After I told them the truth, they doubted and they wouldn't believe until -- they told me they was going to take me to jail, to tell them about what went on and I could leave [] when I give them the story on the tape recorder.
>
> . . .
>
> Q. . . . [T]his one part that incriminates Jason Lively in this case you're saying that they made you say that?
>
> A. Yes.
>
> Q. And they made you say it -- they made you say it because they asked you questions?
>
> A. No, because they threatened to put me in jail if I didn't say it.

(ECF No. 50-2 at 196, 213.) Mr. Salyers testified that for the first several hours of his interview with law enforcement, the officers continually told him what they wanted to hear and that "it took eight hours to get this 15 minute statement . . . ." (*See id.* at 222.) Further, on cross-examination, Mr. Salyers admitted that what he told law enforcement was untrue and repeatedly stated that he was telling the truth on the witness stand:

> Q. But still, you came and you're telling the truth now?
>
> A. Yes.
>
> Q. And why are you telling the truth now?
>
> A. Because I'd rather have a clear conscious about it.
>
> Q. That's the only reason why you're doing it?
>
> A. I don't want to see a man end up in jail for me -- for them making me lie.

demonstrate, Mr. Salyers actually testified and provided all the favorable testimony that Petitioner could have expected. This further supports a finding that witness intimidation did not occur. *See id.* at 384.

With regard to Petitioner's claim of prosecutorial misconduct, Petitioner, first, does not meet his burden of showing that the prosecutor's conduct was improper. *Cf. Allen*, 491 F.3d at 191. The prosecutor, Mr. Bell, suggested that Mr. Brooks contact Mr. Salyers or his family after Mr. Bell discovered that Mr. Brooks was a family friend of the Salyers'. Mr. Bell testified that he did not have knowledge of Mr. Salyers' plan to recant his previous statement to law enforcement and that he did not request or persuade Mr. Brooks to question Mr. Salyers about what he would say on the stand. Mr. Bell simply requested that Mr. Brooks ask Mr. Salyers to get in touch with the prosecutor's office. Without more, the Court cannot find that the prosecutor acted improperly. Additionally, Petitioner fails to show that the conduct prejudiced him to deprive him of a fair trial.

---

Q. And you're being honest about that?

A. Yes, sir.

Q. A hundred percent?

A. Yes, sir.

Q. Did Jason or anyone in his family or friends, anyone, did they tell you to change your story?

A. No, sir.

Q. Did anyone tell you that you should change your story and say what you're saying here in open court today?

A. No, sir. I never spoke to Jason until after I told your investigator that I'd changed -- what the truth was.

. . .

Q. This is just simply the truth?

A. Simply the truth. For me to have peace.

(*Id.* at 227–28; *see also id.* at 231 ("Q. But you never saw Jason Lively that day? A. Never saw Jason that day . . . .").)

*See id.*; *see also Caro*, 597 F.3d at 624–25. While the Court agrees with Petitioner's statement that "[t]he circuit court does not get to act as a 'friend' of the prosecution or its witnesses," (ECF No. 48 at 9), the Court does not find any harm caused by Mr. Brooks' contact with Ms. Prater. Mr. Brooks was an "independent[ly] elected official," (ECF No. 23-4 at 42), who attempted to contact Mr. Salyers in a personal capacity as a family friend. Notwithstanding anything that Mr. Brooks said on the phone to Ms. Prater, even in light of the fact that Mr. Salyers was listening to part of the second conversation, it is clear that Mr. Salyers actually testified at trial and did so in a way that was favorable to Petitioner. *Cf. Teague*, 737 F.2d at 384. Thus, Petitioner was not prejudiced by the actions of Mr. Bell, and his due process rights were not violated.

Based on the foregoing, the Court finds that the Circuit Court of McDowell County's decision that "the prosecuting attorney did not suborn or intimidate a witness," (ECF No. 23-5 at 7–8), involves no unreasonable application of federal law and is not based on an unreasonable determination of the facts in light of the evidence presented. *See* 28 U.S.C. § 2254(d). As such, the Court **OVERRULES** Petitioner's objection.

### C. *Prosecutorial Failure to Disclose Potentially Exculpatory Evidence*

Petitioner further objects to the PF&R's conclusion that Respondent is entitled to summary judgment as to Ground 5 of the § 2254 Petition. (*See* ECF No. 48 at 10; ECF No. 20 at 28–29.) The objection disputes the PF&R's finding that the prosecutor's failure to disclose the identity of the State's CI did not violate his constitutional rights. (*See* ECF No. 48 at 10.) Petitioner argues that "[t]he entire investigation and ultimate prosecution stemmed from statements by informants, whether of the jailhouse or mysterious variety, and the statements of these informants were allowed to be presented to the jury without objection by trial counsel and without limitation by the trial court." (*Id.*) The PF&R, analyzing this claim under the duties of prosecutors set forth by *Brady*

and clarified in *Agurs*, finds that Petitioner "failed to present any evidence indicating how the identity of the [CI] was impeaching or exculpatory evidence." (*See* ECF No. 44 at 60–61 (citing *United States v. Agurs*, 427 U.S. 97, 111 (1976); *Brady v. Maryland*, 373 U.S. 83, 87 (1963)).) The magistrate judge concludes that there was no reasonable probability that the disclosure of the CI's identity would have resulted in a different outcome in Petitioner's criminal proceedings nor was the person's identity material to the verdict so that its suppression was prejudicial. (*See id.* at 62.)

The state court analyzed this claim in both the direct appeal and habeas proceedings. As the WVSCA wrote in its direct appeal decision, an informant "who insisted that his name not be disclosed" told McDowell County Deputy Sheriff Ronald Blevins that he or she saw Petitioner's co-defendant, Mr. Owens, "near the Whitley Clinic on the morning of the fire" and gave law enforcement "a description of the vehicle" he or she saw. (ECF No. 23-2 at 98 (noting that this tip "did not implicate the Defendant").) The WVSCA recognized that the issue was addressed in a post-trial motion denied by the trial court. (*See id.* at 105 n.11, 109.) It further emphasized that Petitioner never asserted, "at any time[,] . . . that anything in the informant's statement would in any way tend to exculpate" him and concluded that "even had [Petitioner] raised the alleged *Brady* issue in a timely manner, the failure to provide the identity of the [CI] did not constitute error." (*See id.* at 109–10.) In the habeas proceeding, the WVSCA set out the *Brady* standard[18] and held as follows:

---

[18] The WVSCA set out the *Brady* standard in the following text:

> There are three components of a constitutional due process violation under *Brady v. Maryland*, 373 U.S. 83 . . . (1963), and *State v. Hatfield*, . . . 286 S.E.2d 402 ([W. Va.] 1982): (1) the evidence at issue must be favorable to the defendant as exculpatory or impeachment evidence; (2) the evidence must have been suppressed by the State, either willfully or inadvertently; and (3) the evidence must have been material, i.e., it must have prejudiced the defense at trial.

(ECF No. 23-5 at 90–91 (quoting Syl. pt. 2, *State v. Youngblood*, 650 S.E.2d 119 (W. Va. 2007)).)

> Petitioner fails to show or even allege that the name of the informant or the informant's possible testimony would have been favorable to petitioner as exculpatory or impeachment evidence. Because he has not satisfied the first prong of this test, we need not consider the other prongs. Therefore, we find that the habeas court did not err in denying petitioner's requested relief on these grounds.

(ECF No. 23-5 at 91.) In light of the WVSCA's finding and rationale, § 2254(d) applies to this Court's review.

In the landmark case of *Brady v. Maryland*, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87; *see also United States v. Jeffers*, 570 F.3d 557, 573 (4th Cir. 2009). Petitioner must prove three elements to establish a violation of his due process rights under *Brady*: (1) that the prosecution withheld or suppressed evidence; (2) that the evidence is favorable; and (3) that the evidence is material. *See Moore v. Illinois*, 408 U.S. 786, 794–95 (1972); *see also United States v. Stokes*, 261 F.3d 496, 502 (4th Cir. 2001). Evidence is "favorable" if it is either exculpatory or if it can be used as impeachment evidence. *See United States v. Bagley*, 473 U.S. 667, 676 (1985); *see also Jean v. Rice*, 945 F.2d 82, 87 n.9 (4th Cir. 1991) (citing *Giglio v. United States*, 405 U.S. 150, 154–55 (1972)) ("Impeachment evidence as well as exculpatory evidence . . . falls within the principles of *Brady*."). Further, evidence will be deemed "material" when "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Jean*, 945 F.2d at 87 (quoting *Bagley*, 473 U.S. at 682). Notwithstanding the aforementioned rule, "[t]here is no general constitutional right to discovery in a criminal case, and *Brady* did not create one . . . ." *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977), *cited in United States v. Polowichak*, 783 F.2d 410, 414 (4th Cir. 1986).

Here, Petitioner makes a purely speculative argument that because the CI's identity was not disclosed, he "is spending life in prison based in large part on the unchallenged statements of someone who may not exist." (ECF No. 48 at 10.) Assuming the CI actually existed, Petitioner alternatively argues that knowing his or her identity would have been important because "[t]he informant may have had some personal animus against the Petitioner, or against his co-defendant, or against the alleged victim, or he might have himself been involved in the alleged crime . . . ." (*Id.*) The Court agrees with the PF&R that Petitioner fails to show how the CI's identity "constituted favorable exculpatory or impeaching evidence." (ECF No. 44 at 62.) More significantly, however, Petitioner does not provide any indication that knowing the CI's identity would have resulted in a different outcome at trial. The CI informed Deputy Blevins, who was a deputy sheriff for the McDowell County Sheriff Department, (*see* ECF No. 23-10 at 107–08), that he or she saw Tommy Owens and Mr. Salyers' pickup truck near the victim's residence on the morning of the fire. (*See* ECF No. 23-4 at 51; ECF No. 23-10 at 121–22.) The CI never mentioned Petitioner to law enforcement. (ECF No. 23-4 at 51.) Deputy Blevins testified at trial that because of the CI's tip, law enforcement initially interviewed Mr. Owens and, subsequently, Mr. Salyers based on Mr. Owens' statement that he was with Mr. Salyers on the morning in question. (ECF No. 23-10 at 121–22.) Even if the prosecution withheld the CI's identity and the identity was "favorable" evidence, Petitioner fails to suggest how his or her identity was "material" evidence. The Court does not find that the failure to disclose the CI's identity in this case "undermine[s] confidence in the outcome" of Petitioner's criminal proceeding. *See Jean*, 945 F.2d at 87. Without a finding of reasonable probability that the evidence would lead to a different result, Petitioner fails to meet his burden under *Brady*. *See Jeffers*, 570 F.3d at 573.

Pursuant to the standard in § 2254(d), the Court finds that the WVSCA's adjudication of this claim did not result in a decision contrary to, or involve an unreasonable application of, federal law, nor was it based on an unreasonable determination of the facts in light of the evidence presented. *See* 28 U.S.C. § 2254(d). The WVSCA was justified in its finding that this claim does not amount to a constitutional violation. Accordingly, the Court **OVERRULES** Petitioner's objection.

### D.  Trial Court Judge's Failure to Recuse Self for Potential Bias

Petitioner objects to the PF&R's conclusion that Respondent is entitled to summary judgment as to Ground 6 of the § 2254 Petition. (*See* ECF No. 48 at 10–12; ECF No. 20 at 29–36.) The objection challenges the PF&R's finding that despite the trial judge's decision not to recuse himself, there was no "risk of actual bias or prejudgment resulting in a due process violation." (ECF No. 44 at 70; ECF No. 48 at 10–11.) Petitioner argues that his rights were infringed because "the trial court judge considered the alleged victim to be a good friend and political compatriot" in that the victim "was a virtual aristocrat within the local Democratic Party, of which the judge was a lifelong member." (ECF No. 48 at 11.) Petitioner points toward Justice Ketchum's dissent in the WVSCA's decision on direct appeal in an attempt to show that had the trial judge recused himself, certain character witnesses would not have been allowed to testify and various Rule 404(b) evidence would have been excluded. (*See id.*; *see also* ECF No. 23-2 at 127–34.)

The WVSCA summarized Petitioner's recusal claim during the habeas proceeding as follows: "Citing *Caperton v. A.T. Massey Coal Co., Inc.*, 556 U.S. 868 (2009), petitioner argues that the trial judge's failure to voluntarily recuse himself, along with his failure to disclose his relationship with Dr. Whitley on the record, establishes an impermissible appearance of possible

impropriety and bias . . . ." (ECF No. 23-5 at 91.) The court went on to distinguish the facts in *Caperton* from the facts in Petitioner's proceeding[19] and held that Petitioner "failed to identify any evidence of actual prejudice or bias on the part of the trial judge's decision to serve as the trial judge, instead making speculative arguments." (*See id.*) As the WVSCA noted, the proper question before it regarding judicial recusal was "whether, under a realistic appraisal of psychological tendencies and human weakness, the interest poses such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately implemented." (*Id.* at 92 (internal quotation marks omitted) (citation omitted) (quoting *Caperton*, 556 U.S. at 870).) The court answered the question in the negative and concluded that "the trial judge . . . did not err in failing to voluntarily recuse himself in the underlying criminal matter." (*Id.*) Accordingly, § 2254(d) applies to this analysis.

"It is axiomatic that '[a] fair trial in a fair tribunal is a basic requirement of due process.'" *Caperton*, 556 U.S. at 876 (alteration in original) (quoting *In re Murchison*, 349 U.S. 133, 136 (1955)). Nevertheless, "most matters relating to judicial disqualification [do] not rise to a constitutional level." *Id.* (alteration in original) (quoting *FTC v. Cement Inst.*, 333 U.S. 683, 702 (1948)); *see also id.* at 891 (Roberts, C.J., dissenting) ("There is a presumption of honesty and integrity in those serving as adjudicators. All judges take an oath to uphold the Constitution and apply the law impartially, and we trust that they will live up to this promise." (internal quotation

---

[19] With regard to *Caperton*, the WVSCA stated the following:

> The facts in *Caperton* are easily distinguished from those in the instant case. The issue in *Caperton* related to an alleged relationship with a litigant, while the issue before this Court is the alleged relationship between a trial judge and a deceased victim in a criminal matter. Unlike in *Caperton*, if the trial judge in the instant case received campaign contributions from Dr. Whitley, there could be no allegation that Dr. Whitley could gain any advantage from favorable rulings from the trial judge in the proceeding below.

(ECF No. 23-5 at 91 (citation omitted).)

marks omitted) (citations omitted)).  The Supreme Court held in its preeminent case on this issue that judicial recusal is necessary when the judge has "a direct, personal, substantial, pecuniary interest" in the case.  *See Tumey v. Ohio*, 273 U.S. 510, 523 (1927).  The *Caperton* Court discussed two instances in which this long-standing rule requires recusal: (1) "where a judge ha[s] a financial interest in the outcome of a case," and (2) "where a judge ha[s] no pecuniary interest in the case but . . . [has] a conflict arising from his participation in an earlier proceeding."  *See* 556 U.S. at 877–80.  Ultimately, the Court held that a judge must recuse himself "when a person with a personal stake in a particular case ha[s] a significant and disproportionate influence in placing the judge on the case by raising funds or directing the judge's election campaign when the case [is] pending or imminent."  *Id.* at 884.  Because "the Due Process Clause has been implemented by objective standards that do not require proof of actual bias," a court analyzing the possibility of judicial bias asks—as the WVSCA did in this case—"whether, 'under a realistic appraisal of psychological tendencies and human weakness,' the interest 'poses such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately implemented.'"  *Id.* at 883–84 (citations omitted) (quoting *Withrow v. Larkin*, 421 U.S. 35, 47 (1975)).  "A presiding judge is not, however, required to recuse himself simply because of unsupported, irrational or highly tenuous speculation."  *United States v. Cherry*, 330 F.3d 658, 665 (4th Cir. 2003) (internal quotation marks omitted) (citing *United States v. DeTemple*, 162 F.3d 279, 287 (4th Cir. 1998)); *Margoles v. Johns*, 660 F.2d 291, 296 (7th Cir. 1981) ("[A] litigant is not denied due process by either the 'appearance' of partiality or by circumstances which might lead one to speculate as to a judge's impartiality.").

Ripe for consideration here is whether the alleged personal relationship between the trial judge and the victim in Petitioner's underlying criminal proceeding was of the nature necessitating

the trial judge's recusal. As a preliminary matter, the Court notes that in resolving an earlier objection it found no merit in Petitioner's argument that the circuit clerk's attempt to contact Mr. Salyers was a constitutional violation. Insofar as Petitioner reasserts that claim in support of his contention that the trial judge's response to it shows actual bias or prejudice, the Court similarly finds the argument unavailing. However, the Court agrees with Petitioner that his co-defendant's acquittal after a trial over which the same judge presided is irrelevant and not a proper consideration for this Court in determining whether the judge should have recused himself in Petitioner's case.

Judge Booker Stephens, the trial judge in Petitioner's underlying criminal proceeding, testified at the state habeas court's evidentiary hearing. The following excerpt of Judge Stephens' testimony relates to his familiarity with the victim and whether he contemplated recusal:

Q. Did you personally know Doc Whitley?

A. Yes.

Q. How did you know Doc Whitley?

A. Well, I knew him as a person and I knew him in politics.

Q. When you say you know him "in politics," what do you mean by that?

A. Well, as you know, circuit court judges are elected in West Virginia, partisan elections, and -- which means we have to campaign and run for office. So in 1984, when I was a candidate -- well, let's go back to 1978 when I was a candidate for the House of Delegates. That is probably when I met Doc Whitley.

Q. Would you say that Doc Whitley was deeply involved in Democratic politics . . . in McDowell County?

A. Yes.

Q. Would you say you're deeply involved in Democratic politics in McDowell County?

A. Well, judges are supposed to not be, but, as I said, we have to run for election; so I am political.

. . .

Q. Did you and Doc Whitley share a political party?

A. I've always been a Democrat and will always be a Democrat.

Q. Did you ever receive campaign contributions from Doc Whitley?

A. I do not know that. I'm not saying it didn't happen, but I do not personally know that.

Q. Have you ever served with Doc Whitley on any boards, committees, or any other bodies?

A. No.

. . .

Q. Would you characterize Doc Whitley as a friend?

A. Well, yes. Yes.

. . .

Q. Do you believe that it was proper for you to preside over a murder case in which a friend is the victim?

A. Yes. In this instance, I believe it was -- it was proper.

Q. In fact, is it accurate that you specifically asked to remain on the case when the venue shifted?

A. Oh, yes. When the case was transferred to Putnam County, I said that I would follow the case as the judge in that case, and, quite frankly, the reason for that is that the people of McDowell County had elected me to be their circuit court judge, and I didn't feel that I should put any other judge in that situation, because I was the circuit judge and I felt that I could be fair and impartial to both sides in the case. So I did follow the case.

Q. Did you disclose your relationship with Doc Whitley on the record at any time?

A. I don't know that I did that.

Q. Is it part of a circuit court judge's duties to hear omnibus habeas motions?

A. It is.

Q. Why did you recuse yourself from this one?

A. Because there was a motion filed by Mr. Lively to -- for me to voluntarily recuse in the matter, and although I felt that I could be fair, since he raised that, in order to avoid even the appearance of impropriety, I decided to not remain as the judge in that matter.

Q. Did you not believe there was a possible appearance of impropriety at the trial?

A. No, I did not.

Q. What changed?

A. Well, what changed is, is that a motion was filed in the habeas corpus situation. A motion was filed asking me to step down. In the *Lively* trial itself, in that case, I stayed on that case because I felt that I could be fair and impartial to both sides, and while I have admitted that I had a friendship with Doc Whitley, you need to know that I also had a friendship with Kathy Lively. I had as much respect for Doc Whitley and Kathy Lively as anyone could have, and they both respected me.

(ECF No. 23-4 at 66–71.) Judge Stephens continued to answer questions about Mr. Brooks' attempted contact with Mr. Salyers, and Judge Stephens testified that he did not think it was proper for anyone to contact witnesses for the purpose of telling them to do something and that he admonished the State based on Petitioner's allegation that the State facilitated the attempted contact. (*Id.* at 71–79.)

Section 2254(d)'s phrase "contrary to federal law" means that the state court "arrive[d] at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or "decide[d] a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412–13. Despite Petitioner's strained attempt to analogize the facts underlying his claim to those in *Caperton*, where a civil litigant donated millions of dollars to help elect a justice to a state supreme court already slated to decide his case, *see* 556 U.S. at 884, the

facts before this Court are unquestionably distinct.  Even if the victim in the underlying criminal case here donated a large amount of money to Judge Stephens' campaigns, which Judge Stephens did not admit, the underlying criminal case was not pending or imminent at the time of the campaign contributions, and the decedent obviously is not a "person with a personal stake" in the outcome of the proceeding.  *Cf. id.*  While Judge Stephens considered the victim a friend like he did Petitioner's mother, Petitioner simply has not provided the Court with anything beyond pure speculation to show that Judge Stephens' decision not to recuse himself "pose[d] such a risk of actual bias or prejudgment" that Petitioner's due process rights were violated.  *See id.* at 883–84.  Petitioner has not directed the Court to, nor has the Court found, Supreme Court precedent on this particular question of law regarding the recusal of a trial judge who knew the victim in a murder case tried before him.  Therefore, this Court cannot find that the WVSCA's decision on this issue is "contrary to" existing Supreme Court precedent because it is not "diametrically different, opposite in character or nature, or mutually opposed," *Williams*, 529 U.S. at 405 (internal quotation marks omitted), to any Supreme Court case.  *Cf. Railey v. Webb*, 540 F.3d 393, 413–14 (6th Cir. 2008).

Finally, Petitioner argues that Judge Stephens' decision to allow "a parade of Rule 404(b) witnesses" is "indicative of a bias, conscious or unconscious, on the judge's part."  (*See* ECF No. 48 at 11.)  Petitioner does not argue in this proceeding that the amount of Rule 404(b) evidence admitted at trial violated his due process rights as he did on direct appeal, (*see* ECF No. 23-2 at 29–37, 111–16); *see also infra* note 20, but rather he avers that Judge Stephens' allowance of the character evidence illustrated his bias, (*see* ECF No. 48 at 11).  Notably, the appearance of bias does not automatically amount to presumptive bias mandating recusal under the Due Process Clause.  *See, e.g.*, *Richardson v. Quarterman*, 537 F.3d 466, 476 (5th Cir. 2008), *cert. denied*, 555

U.S. 1173 (2009), *cited in Gamble v. Hoke*, No. 2:10–cv–00690, 2011 WL 4528386, at \*17 (S.D. W. Va. July 14, 2011) ("[T]he Supreme Court of the United States has not held in its decisions, not even in *dicta*, that the mere appearance of bias on the part of a state trial judge, without more, violates the Due Process Clause."); *Del Vecchio v. Ill. Dep't of Corr.*, 31 F.3d 1363, 1371–72 (7th Cir. 1994) (en banc) ("The Supreme Court has never rested the vaunted principle of due process on something as subjective and transitory as appearance."). As the PF&R notes, Judge Stephens allowed the admission of evidence showing certain prior bad acts or crimes, including witness testimony. (ECF No. 44 at 70 n.9.) While this unfavorable Rule 404(b) evidence was admitted, Judge Stephens took appropriate precautions to ensure that the evidence was considered only for its intended purpose. He conducted a lengthy hearing prior to admitting the evidence, (*see* ECF No. 23-6 at 68–184), gave the jury a limiting instruction prior to testimony, and again gave a limiting instruction in the final jury charge. (*See* ECF No. 44 at 70 n.9 (citing ECF No. 23-6 at 67–183; ECF No. 23-11 at 123).) The Court does not find that the admission of various Rule 404(b) evidence, which the WVSCA considered and found proper on direct appeal, so tainted the proceeding as to show actual bias or prejudgment by Judge Stephens.[20]

---

[20] As noted above, Petitioner does not raise as a ground for relief in the § 2254 Petition the number of Rule 404(b) witnesses allowed at trial. (*See* ECF No. 20.) *See also Humphreys*, 194 F.3d at 1306. However, the issue of Rule 404(b) witnesses is referred to twice within other grounds for relief in the Petition. First, Petitioner mentioned the number of Rule 404(b) witnesses in Ground 6 of the § 2254 Petition by noting that Justice Ketchum discussed the issue in his dissent to the WVSCA majority's direct appeal opinion. (*See id.* at 35.) Petitioner does not claim that this presents an independent ground for relief in the current proceeding. Additionally, he referenced the issue in Ground 7 of the § 2254 Petition in support of his argument that the alleged hearsay testimony by Deputy Blevins as to information learned from the CI violated his constitutional right under the Confrontation Clause. (*See id.* at 37 ("The petitioner's trial included *fourteen* 404(b) witnesses, the *only* purpose of whose testimony was to emphasize, ad nauseam, the notion that the petitioner and Mr. Owens operated in perpetual hand-in-glove cahoots." (emphasis in original)).) Again, as Magistrate Judge Aboulhosn states in the PF&R, "Petitioner does not assert a federal *habeas* claim based upon the improper admission of Rule 404(b) evidence . . . ." (ECF No. 44 at 63 n.6.)

Even if Petitioner raised this claim as a ground for relief, it would not have merit. In considering claims regarding state evidentiary rulings, federal habeas courts "do not sit to review the admissibility of evidence under state law unless erroneous evidentiary rulings were so extreme as to result in a denial of a constitutionally fair proceeding." *Burket v. Angelone*, 208 F.3d 172, 186 (4th Cir. 2000), *cert. denied*, 530 U.S. 1283; *see also Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991) ("Today, we reemphasize that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."). The trial court in Petitioner's

Based on the foregoing, the Court finds that in making its decision that Judge Stephens'

refusal to voluntarily recuse himself in Petitioner's criminal trial was not a constitutional violation,

the WVSCA did not unreasonably apply, or make a decision contrary to, federal law or base its

---

criminal proceeding conducted a Rule 404(b) hearing before allowing the witnesses to testify. (*See* ECF No. 23-6 at 68–184.) The trial court determined that evidence of certain prior acts of Petitioner and Mr. Owens was admissible to show motive, plan, and intent in addition to a common scheme and plan of Petitioner and Mr. Owens to commit crimes of violence. (*See id.* at 101–03, 144, 176.) The trial court gave the jury a limiting instruction prior to the testimony and again gave a limiting instruction in the final jury charge. (See *id.* at 102, 144, 177; ECF No. 23-8 at 231; ECF No. 23-11 at 123.)

The WVSCA found no error regarding the trial court's admission of the Rule 404(b) evidence in its decision on direct appeal:

> [I]t is undisputed that the State properly filed a detailed notice of intention to introduce the evidence at issue pursuant to West Virginia Rule of Evidence 404(b). Further, the trial court conducted a two-hour in camera hearing on November 6, 2006, and made specific findings on the record that the State had proven by a preponderance of the evidence that the subject "crimes, wrongs, or acts" had occurred and that the State was offering the evidence for a permissible purpose within the confines of West Virginia Rule of Evidence 404(b). Specifically, the trial court found that the evidence of the stolen laptop was properly being offered to prove motive, plan and intent; the evidence of the Defendant and Mr. Owens attacking two individuals, one of whom was a disabled coal miner, and engaging in a fistfight against them, was properly being offered to show common scheme or plan of the Defendant and Mr. Owens to act in concert with one another to carry out crimes of violence; and the evidence of the Defendant's and Mr. Owens' attempt to commit arson of building using beer bottles filled with kerosene, gasoline, or some other fuel was properly admitted to show common scheme or plan of the Defendant and Mr. Owens to act together in carrying out crimes of violence. The trial court also determined that the evidence was more probative than prejudicial to the Defendant. Additionally, the trial court properly gave two cautionary instructions to the jury regarding the evidence at the time it was being offered by the State, and instructed the jury on the same issue during the general charge to the jury at the request of the State.
>
> . . .
>
> Consequently, the Court finds no error in the trial court's decision to admit certain evidence of the Defendant's prior criminal conduct under the provisions of West Virginia Rule of Evidence 404(b).

(ECF No. 23-2 at 114–16.)

Petitioner has not explained how the trial court's allowance of this evidence was "so extreme as to result in a denial of a constitutionally fair proceeding," *Burket*, 208 F.3d at 186, and he does not dispute the PF&R's finding that "[e]ven disregarding the Rule 404(b) testimony, there was adequate evidence to support the jury verdict." (*See* ECF No. 44 at 71 n.9.) Further, the Court does not conduct a review of whether a state court appropriately admitted evidence under the West Virginia Rules of Evidence. *See Estelle*, 502 U.S. at 67–68. Therefore, despite the fact that Petitioner does not raise a standalone claim in the § 2254 Petition based on the admission of Rule 404(b) evidence, the Court does not find that the WVSCA's denial of the Rule 404(b) claim was contrary to, or an unreasonable application of, clearly established federal law or based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d). Insofar as this passing comment in Petitioner's conclusion to his objections can be construed as a specific objection, it is **OVERRULED**.

decision on an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d). As such, the Court **OVERRULES** this objection.

### E. Hearsay, Confrontation Clause, and Potentially Exculpatory Evidence

Lastly, Petitioner objects to the PF&R's conclusion that Respondent is entitled to summary judgment as to Ground 7 of the § 2254 Petition. (*See* ECF No. 48 at 12–13; ECF No. 20 at 36–37.) Petitioner contests the PF&R's finding that his due process rights were not violated, alleging "the admission of evidence in violation of the hearsay rule, the Confrontation Clause, and the existence of potentially exculpatory evidence." (ECF No. 48 at 12.) Petitioner does not expand upon his previous argument regarding the existence of potentially exculpatory evidence beyond a statement that he was "deprived of any opportunity to use the informant's identity and motivations to cast doubt on the genesis and quality of the State's case." (*Id.* at 12–13.) This Court discussed earlier and found no merit in Petitioner's claim under *Brady* regarding the prosecution's failure to disclose the CI's identity. Thus, the Court will not repeat that analysis and will only address Petitioner's objection insofar as it invokes the issues of hearsay and the Confrontation Clause.

The WVSCA addressed the alleged trial court errors regarding the hearsay rule and the Confrontation Clause on direct appeal. (*See* ECF No. 23-2 at 103–10.) The court dismissed this claim under a plain error analysis in the following passage:

> Specifically, the statement at issue arises from Deputy Blevins' testimony that a [CI] reported to police that he saw Mr. Owens in Mr. Salyers' truck near Dr. Whitley's clinic the morning of the fire. Importantly, the [CI]'s statement was not admitted into evidence. Instead, the deputy testified that the information given to him by the [CI] was the reason he sought to interview Mr. Owens and Mr. Salyers.
>
> . . .
>
> The substance of the first statement at issue,[21] that of the [CI], merely reflected that a Mr. Owens was seen at Dr. Whitley's residence the morning of the fire. The

---

[21] The Court notes that the WVSCA analyzed two statements referenced by witnesses at trial and subject to Petitioner's hearsay and Confrontation Clause claim on direct appeal. (*See* ECF No. 23-2 at 104.) The first statement that the

WVSCA addressed was made during Deputy Ronald Blevins' testimony and related to information from the CI, and the second was made at trial by inmate Jason Ritchie about statements by a fellow inmate, Michael Cline. (*See id.*) Petitioner's objection here only relates to the first statement. However, in the concluding portion to Petitioner's objections, he references the second statement in passing. (*See* ECF No. 48 at 14 ("The court permitted the prosecution to present testimony detailing, second- and third-hand, the supposed statements of . . . a jailhouse informant without objection by trial counsel or limitation by the court.").) This statement is not analyzed within the PF&R because it was not raised as a basis for habeas relief in the § 2254 Petition. (*See* ECF No. 20.) *See also Humphreys*, 194 F.3d at 1306.

Mr. Ritchie, who met Petitioner at Southwestern Regional Jail in Logan County, West Virginia, was called to testify on behalf of the State. (*See* ECF No. 50-2 at 109–10.) He testified that while incarcerated with Petitioner, Petitioner admitted to him that Petitioner and Mr. Owens "went into rob [Dr. Whitley] and they ended up killing him . . . ." (*Id.* at 112–13.) Mr. Ritchie then indicated that he told another inmate, Michael Cline, about the statements Petitioner made regarding the crimes for which he was incarcerated. (*See id.* at 114.) Mr. Ritchie testified that he was identified as having knowledge of Petitioner's actions because Mr. Cline told the police what Mr. Ritchie told him. (*Id.* at 115.) Deputy Blevins then set up an interview with Mr. Ritchie based on Mr. Cline's admission to police about what Mr. Ritchie told him. (*See id.* at 116.)

The WVSCA addressed this claim on direct appeal and dismissed it as follows:

> The second statement that the Defendant now contends was erroneously admitted during trial was that of jail inmate, Michael Cline, reporting to the police statements made to him by fellow inmate Jason Ritchie wherein Mr. Ritchie alleged the Defendant inculpated himself in the crimes against Dr. Whitley. Once again, no statement of Mr. Cline was admitted into evidence. Nor was what Mr. Cline reported to police admitted for the truth of the matter asserted.
>
> . . .
>
> The second statement was nothing more than Jason Ritchie's testimony that he told Mr. Cline about the Defendant's admissions to him (Ritchie), and that it was Mr. Cline who told the police.

(ECF No. 23-2 at 104, 108.) The WVSCA went on to hold that this statement was not offered as evidence at trial or used to prove the truth of the matter asserted, and it involved "mere gratuitous comments by an inmate witness as to how he believed the police learned of his statements." (*See id.* at 108 (citing Syl. pt. 1, *State v. Maynard*, 393 S.E.2d 221 (W. Va. 1990)).) Thus, the WVSCA held that "there was no error and no violation of the Confrontation Clause" with regard to this statement. (*Id.* at 109.)

Although Petitioner does not address the jailhouse informant's statement in his substantive objections, (*see* ECF No. 48 at 12–13), the Court finds that the statement was not offered for its truth. Whether Mr. Ritchie actually said to Mr. Cline everything that Mr. Cline then told police was not at issue during Mr. Ritchie's testimony. Rather, the prosecutor was eliciting information as to how Mr. Ritchie became known to police as having information about Petitioner's commission of the crimes. (*See* ECF No. 50-2 at 114–15 ("Q. After Mr. Lively made those statements to you about his commission of these crimes, did you report it to anyone? A. No. Just Michael Cline. . . . Q. What happened in connection with Michael Cline that led to you being identified? A. Michael Cline went to the police and told the police . . . what I told him.").) As explained in the analysis related to the first challenged statement involving the CI, statements referenced to explain the course of investigative activity and why police become interested in speaking with certain individuals are not hearsay and do not implicate the Confrontation Clause. *See Crawford*, 541 U.S. at 59 n.9; *United States v. Washington*, 461 F. App'x 215, 220–21 (4th Cir. 2012) (unpublished opinion); *United States v. Hines*, 380 F. App'x 320, 322 (4th Cir. 2010) (per curiam) (unpublished opinion); *see also United States v. Maggiore*, 125 F. App'x 343, 345 (2d Cir. 2005) (unpublished opinion) (denying the appellant's *Crawford* claim because the jailhouse informants' statements to the prosecution were, at least in part, not introduced at trial for their truth), *cert. denied*, 546 U.S. 1035. Therefore, the WVSCA did not unreasonably apply, or make a decision contrary to, federal law and did not base its decision on an unreasonable determination of the facts. 28 U.S.C. § 2254(d). Insofar as Petitioner's passing comment in the conclusion to his objections regarding the jailhouse informant's statements can be construed as a substantive and specific objection to the PF&R—despite the fact that this issue was not addressed in the § 2254 Petition or the PF&R—it is **OVERRULED**.

deputy who referred to the statement in his testimony did so only to explain the reason that he went to interview Mr. Owens. The information from the [CI] did not implicate the Defendant in any manner.

. . .

As stated earlier, neither of the statements at issue were offered as evidence at trial. Nor were the references to either by trial witnesses offered to prove the truth of the matter asserted. The first was offered to explain why law enforcement took the action to go and interview Mr. Salyers in conjunction with the investigation of the victim's death. . . . Under these circumstances, there was no error and no violation of the Confrontation Clause. . . . It is clear that the testimonial references to out-of-court statements had no adverse effect on the substantial rights of the defendant; and in no way adversely affected the fairness, integrity, or public reputation of the judicial proceedings in the proceeding below . . . .

(*Id.* at 104, 108–09.) Accordingly, the standard set forth in § 2254(d) applies.

"In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." U.S. Const. amend. VI. "Witnesses" in this regard mean those who "bear testimony" against the accused, whether or not their statements are made in court, *see Crawford v. Washington*, 541 U.S. 36, 51 (2004), and "testimony" refers typically to "[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact." *Id.* (alteration in original) (citation omitted). The Supreme Court in *Crawford* interpreted the Confrontation Clause to forbid "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination," regardless of reliability. *See id.* at 53–54, 60–61 ("Where testimonial statements are involved, we do not think the Framers meant to leave the Sixth Amendment's protection to the vagaries of the rules of evidence, much less to amorphous notions of 'reliability.'"); *see also id.* at 68 ("We leave for another day any effort to spell out a comprehensive definition of 'testimonial.'"); *United States v. Dargan*, 738 F.3d 643, 650 (4th Cir. 2013). Nevertheless, the statement at issue must be hearsay to implicate the Confrontation Clause because

testimonial statements may be admitted "for purposes other than establishing the truth of the matter asserted." *See Crawford*, 541 U.S. at 59 n.9 (citing *Tennessee v. Street*, 471 U.S. 409, 414 (1985)); *see also United States v. Dixon*, 481 F. App'x 806, 810 (4th Cir. 2012) (per curiam) (unpublished opinion) (holding that "because th[e] testimony was not admitted for the truth of the matters asserted, it was not hearsay and its admission did not violate the Confrontation Clause"). For example, "an out of court statement is not hearsay if offered for the limited purpose of explaining why a government investigation was undertaken." *United States v. Love*, 767 F.2d 1052, 1063 (4th Cir. 1985).

Here, Petitioner's claim relates to the following trial testimony by Deputy Blevins about a statement made to him by the CI:

> Q. As you continued to pursue the investigation in the weeks after Dr. Whitley's death, did you receive information that could be characterized as a tip or confidential report that Tommy Owens may have been seen near the Whitley Clinic the morning of the fire?
>
> A. Yes, I did.
>
> Q. In addition to that information and his name, did you also receive information concerning the type of motor vehicle that was seen there at the point where Mr. Owens was at the Whitley Clinic that morning?
>
> A. Yes, sir.
>
> . . .
>
> Q. Based on that information that you received, was Tommy Owens questioned about that possibility?
>
> A. Yes, he was.

(ECF No. 23-10 at 121–22.) Deputy Blevins continued to testify that Mr. Owens' subsequent statement that on the morning of the fire he had been with Mr. Salyers led the officers to speak with Mr. Salyers. (*See id.* at 122.) While defense counsel did not object to Deputy Blevins'

testimony as to the CI's statements, the Court agrees with both the PF&R and WVSCA decision that the statements were not admitted for their truth. For instance, the CI's statement suggesting that Mr. Owens was near the Whitley Clinic shortly after the fire was not admitted at Petitioner's trial to show that Mr. Owens was, in fact, at the scene that day. Further, the CI's statement concerning the type of vehicle seen at the Whitley Clinic that morning was not admitted to prove that the vehicle actually was at the clinic. Rather, both of these statements were used in an effort to show why law enforcement became interested in questioning Mr. Owens and, subsequently, Mr. Salyers.

Whether the CI's statements to Deputy Blevins were testimonial is immaterial to this analysis because even if they were testimonial, the Confrontation Clause does not bar the admission of statements "for purposes other than establishing the truth of the matter asserted." *Crawford*, 541 U.S. at 59 n.9; *see also United States v. Hendricks*, 395 F.3d 173, 183 (3d Cir. 2005) ("[E]ven if we were to hold that [the CI's] statements within the conversations are themselves testimonial, . . . such an outcome would not preclude the United States from introducing [the CI's] statements for a purpose other than establishing the truth of the matters contained therein."). As provided above, the record is clear that the statements were not offered for their truth, but rather they were used to describe the officers' investigation following the fire at Dr. Whitley's residence. The Fourth Circuit has addressed this issue on similar facts and held that testimony of this type does not implicate the Confrontation Clause. *See United States v. Washington*, 461 F. App'x 215, 220–21 (4th Cir. 2012) (unpublished opinion) ("[T]he [CI]'s out-of-court statements to [law enforcement] were properly admitted not for the truth of the matter asserted, but rather for the limited, permissible purpose of explaining the investigative activity that ensued."); *see also United States v. Hines*, 380 F. App'x 320, 322 (4th Cir. 2010) (per curiam)

(unpublished opinion) ("Here, a government witness testified to information provided by the [CI] to explain why the authorities undertook an investigation into Hines. Accordingly, as this information was not offered for its truth, the introduction of these statements did not violate the Confrontation Clause."). Therefore, the statements are not hearsay, and the Confrontation Clause is not violated by Deputy Blevins' testimony at trial about information provided by the CI.

In finding that "there was no error and no violation of the Confrontation Clause," (ECF No. 23-2 at 109), the WVSCA did not unreasonably apply, or make a decision contrary to, federal law, nor did it base its decision on an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d). Consequently, the Court **OVERRULES** this final objection.

## *IV. CONCLUSION*

For the foregoing reasons, the Court **OVERRULES** Petitioner's objections, (ECF No. 48), **ADOPTS** the PF&R insofar as it is consistent with this Memorandum Opinion and Order, (ECF No. 44), **GRANTS** Respondent's Motion for Summary Judgment, (ECF No. 36), **DENIES** Petitioner's Motion for Summary Judgment, (ECF No. 40), **DISMISSES** this case, and **DIRECTS** the Clerk to remove this case from the Court's docket.

The Court has also considered whether to grant a certificate of appealability. *See* 28 U.S.C. § 2253(c). A certificate will be granted only if there is "a substantial showing of the denial of a constitutional right." § 2253(c)(2). The standard is satisfied only upon a showing that reasonable jurists would find that any assessment of the constitutional claims by this Court is debatable or wrong and that any dispositive procedural ruling is likewise debatable. *See Miller–El v. Cockrell*, 537 U.S. 322, 336–38 (2003); *Slack v. McDaniel*, 529 U.S. 437, 484 (2000); *Rose v. Lee*, 252 F.3d 676, 683–84 (4th Cir. 2001). Because Petitioner has not made a substantial showing of the denial of a constitutional right in the § 2254 Petition and objections to the PF&R, the Court **DENIES** a

certificate of appealability.  Pursuant to Rule 11(a) of the Rules Governing Proceedings Under 28 U.S.C. § 2254, Petitioner may not appeal the Court's denial of a certificate of appealability, but he may seek a certificate from the court of appeals under Federal Rule of Appellate Procedure 22.

**IT IS SO ORDERED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

ENTER:       September 21, 2017

_____
THOMAS E. JOHNSTON
UNITED STATES DISTRICT JUDGE